Argued and submitted March 9, 1994, decision of the Court of Appeals affirmed, revised final order of BOLI reversed, and case remanded to BOLI with instructions October 5, 1995

## James V. MELTEBEKE,
*Respondent on Review,*

*v.*

## BUREAU OF LABOR AND INDUSTRIES,
State of Oregon,
*Petitioner on Review.*

### (BOLI 29-90; CA A68770; SC S40567)

903 P2d 351

Richard D. Wasserman, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the petition were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Kelly E. Ford, Beaverton, argued the cause for respondent on review.

David K. Allen and Richard C. Busse, Salem, filed a brief on behalf of *amicus curiae* the American Civil Liberties Union Foundation of Oregon, Inc.

Doug Vande Griend and Jay R. Jackson, Salem, filed a brief on behalf of *amicus curiae* Western Center for Law and Religious Freedom.

FADELEY, J.

Unis, J., filed a specially concurring opinion.

**FADELEY, J.**

Petitioner, an employer, sought review of a revised final order of the Bureau of Labor and Industries (BOLI), which concluded that he had violated ORS 659.030(1)(b) by discriminating against an employee on the basis of religion. The Court of Appeals reversed, on the basis that petitioner had established an affirmative defense under Article I, sections 2 and 3, of the Oregon Constitution. *Meltebeke v. Bureau of Labor and Industries*, 120 Or App 273, 852 P2d 859 (1993). We affirm the decision of the Court of Appeals.

## FACTS AND PROCEDURAL BACKGROUND

■    In this court, there is no challenge to the findings of fact made by BOLI in its revised final order. Those findings, where they are of fact, therefore, are the facts for purposes of our judicial review. *See Jefferson County School Dist. No. 509-J v. FDAB*, 311 Or 389, 393 n 7, 812 P2d 1384 (1991) (unchallenged findings of fact are the facts for purposes of judicial review of an administrative agency's final order).

James Meltebeke (Employer) was, at all material times, an employer subject to the provisions of ORS chapter 659. He was the sole proprietor of a painting business in St. Helens. From June 17 to July 27, 1988, he employed Complainant as a painter. In this small business, Employer was normally Complainant's direct supervisor. They worked near each other from four to eight hours per day. Employer dismissed Complainant for poor work performance.[1]

Employer is an evangelical Christian. He believes that he has a religious duty to tell others, especially non-Christians, about God and sinful conduct. That duty, he believes, includes initiation of discussions about religion and includes "preaching" or "witnessing" even when "an individual doesn't want to hear." It also includes denouncing sin by telling others that they are sinners where he believes that is appropriate.

In the month during which Employer employed Complainant, Employer invited him to attend church eight

---

[1] The parties stipulated and BOLI found as fact that the discharge was not related to the religious matters on which this case is based. BOLI also found that Employer made no religious inquiry or test before hiring.

times (twice a week). The first such request occurred two days after Complainant was hired. Complainant repeatedly told Employer that he "could not make it" but that he "would think about it." He never did attend. Employer also tried to call Complainant at home to encourage him to attend church.

On more than one occasion, Employer told Complainant that he was a sinner who would go to hell, because he slept with his fiancee and because he did not attend church. Employer made similar remarks to the fiancee, whom Complainant later married, and to Complainant's mother. Employer told Complainant that "he had to be a good Christian to be a good painter, and that he should go to church to be a good painter." He also told Complainant that he wanted to work with a Christian, because he believed that a Christian "wouldn't be stealing stuff" while working "in people's homes, inside repainting."

Complainant never informed Employer that he felt offended, harassed, or intimidated by anything that Employer said to him or to anyone else. He did not ask Employer to cease. Employer "did not know that his comments were unwelcome or offensive to Complainant," the agency found as fact. Employer did not "criticize[] any religion by name" to Complainant or apply any "religious slur" to Complainant or otherwise.

Complainant was 22 years old at the time of the hearing. He has completed 10th grade and is considered to be learning disabled. Complainant was a "loner" who had little interest in religion. While in the Job Corps in the mid-1980s, he was issued Bibles, which he "thr[e]w * * * in the garbage[;] [he] didn't want to mess with it." Complainant attended Sunday School and Christmas Eve services when he was "very little" but had not gone to church regularly since he was in kindergarten. While employed by Employer, he did not attend any church.

Complainant felt "embarrassed," "very uncomfortable," "humiliated," "bug[ged]," "reluctant to go to work each morning," and "out of place" because of his perception that Employer "was pushing God down his throat, and he did not want to have anything to do with it." Complainant "would come home from work angry. * * * [H]e was coming

home after work and 'basically exploding.' " Employer's "comments caused Complainant to hate churches. Now he 'can't stand looking at them' * * * [and] 'can't stand' to talk about religion. He 'gets upset' whenever religion is mentioned."

Complainant did not complain or request that Employer cease inviting him or discussing religious topics, because "you don't say that to your boss. I mean, at least I don't. I told him I couldn't make it [to church] all the time. He should have got the hint, and I ain't a rude person that tells someone that's his religion, that's not mine."[2] "Complainant thought his job might be affected by his unwillingness to go to church. * * * He did not know what to do because [Employer] was his boss. * * * After two weeks of employment with [Employer], Complainant began looking for other work because he was so uncomfortable about [Employer's] religious comments."[3]

Sometime after his termination, Complainant filed a complaint with BOLI, alleging that he was the victim of an unlawful employment practice by Employer. Specifically, Complainant alleged that he had been subjected to religious discrimination in the form of religious harassment.

In its final order dated February 4, 1992, BOLI found as ultimate facts that Employer's conduct was directed at Complainant because of Complainant's religious beliefs; that Employer's conduct was subjectively "unwelcome and offensive" to Complainant; and that Employer's conduct "was sufficiently pervasive so as to alter the conditions of employment, and had the effect of creating an intimidating and offensive working environment." BOLI concluded that Employer had violated ORS 659.030(1)(b) by violating BOLI's implementing rule, which is a "test for religious

---

[2] "If Complainant had told [Employer] to quit asking him to attend church, [Employer] 'might have ceased for awhile, but * * * would check him out again sometime later on * * *.' "

[3] Moreover, Complainant testified that Employer's "comments affected [Complainant's] work performance and gave him a bad attitude." And, although Employer discharged Complainant based on the latter's poor work performance, "[a]t the time of his discharge, Complainant thought the reason he was fired was that he had not gone to church." See note 1, above, for the stipulation and finding of fact on that question.

harassment" adopted in *In the Matter of Sapp's Realty*, No. 11-83, (BOLI 1985).[4]

BOLI withdrew and revised its final order after employer objected. In the amended opinion portion, BOLI explained that the evidence demonstrated that Employer's conduct occurred because "[C]omplainant did not share [Employer's] religious beliefs" and that Employer's conduct was unwelcome to Complainant subjectively. BOLI also explained that, under the totality of the circumstances and applying an objective, "reasonable person" standard, Employer's conduct had the effect of creating an "intimidating, hostile, or offensive working environment." Also in its amended opinion, BOLI considered, and rejected, Employer's affirmative defenses, based on Article I, sections 2, 3,[5] and 8, of the Oregon Constitution, and the First Amendment to the United States Constitution.[6]

BOLI determined that Complainant was entitled to $3,000 in compensatory damages. It ordered that Employer pay those damages plus interest; that Employer "cease and desist from discriminating against any employee on the basis of religion"; and that Employer post at his work sites copies of ORS 659.030 and related notices.

Employer appealed, arguing that BOLI's order violated his rights under the above-enumerated constitutional provisions. The Court of Appeals reversed and remanded the case to BOLI for reconsideration. *Meltebeke.* The Court of Appeals concluded that BOLI's rule, as applied in this case,[7] violated Article I, sections 2 and 3. That court reasoned that the burden imposed on religion by the rule would be acceptable if the rule were "essential" to accomplish an "overriding governmental interest" and that the rule is not the "least restrictive" means of protecting that interest, because it does not require that the individual "intend" to create a hostile,

---

[4] The statute and rule are quoted in the discussion below, 322 Or at 139.

[5] Those state constitutional provisions are quoted below, 322 Or at 145-46.

[6] Employer argued that his conduct was privileged, even if it violated a statutorily authorized rule.

[7] The Court of Appeals stated that the rule "is not subject to a facial attack" and "is not invalid, because it has other constitutional applications." *Meltebeke,* 120 Or App at 280.

offensive, or intimidating environment. 120 Or App at 278-80. The court did not reach Complainant's other constitutional claims. *Id.* at 282.

Judge Edmonds concurred specially, stating that, if the constitutional issues were reached, he would hold that BOLI's rule violated Article I, section 3, on its face, because "it fails to accommodate an employer's expression of religious belief or opinion." *Id.* at 287-91. But he reasoned that the court need not reach the constitutional issues presented, for several reasons: BOLI's rule exceeded its statutory rulemaking authority, *id.* at 283; the findings of discrimination due to Complainant's religious beliefs, *id.* at 285, and that a hostile environment existed were not supported by substantial evidence in the record, *id.* at 286-87; and, in any event, BOLI's conclusions did not follow from the findings that it made, *id.* at 287.

Judge Riggs dissented, reasoning that "freedom *from* religion is entitled to the same level of constitutional * * * protection in the workplace" as "freedom to *practice* religion." *Id.* at 293 (emphasis in original). He would hold that "[c]onduct is not always protected merely because someone chooses to invoke constitutional guarantees of expression or religion" and that "the intensity of uninvited religious proselytizing by [Employer] constituted common harassment and religious discrimination" that was not constitutionally protected. *Ibid.*

Allowing BOLI's petition for review, this court now holds that the complaint should be dismissed for the reasons that follow.

## SUBCONSTITUTIONAL ISSUES

The primary issues in this administrative review are whether the religious harassment rule, adopted by BOLI for the purpose of implementing ORS 659.030(1), violates Article I, sections 2, 3, or 8, of the Oregon Constitution, or the First Amendment to the United States Constitution;[8] and, if not, whether application of that rule to Employer violates any of those constitutional provisions. *See* ORS 183.482(8)(a), (b) (providing standards of review of a contested case proceeding,

---

[8] Relevant constitutional provisions are set out in the discussion below.

for erroneous interpretation of a provision of law and for impermissible exercise of discretion in violation of constitution). Before reaching those questions, however, the court must consider pertinent subconstitutional issues. *Zockert v. Fanning*, 310 Or 514, 520, 800 P2d 773 (1990); *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 687 P2d 785 (1984).

A. *BOLI's Rule*

ORS 659.030(1) provides in part:

"[I]t is an unlawful employment practice:

"* * * * *

"(b)  For an employer, because of an individual's * * * religion * * * to discriminate against such individual in compensation or in terms, conditions or privileges of employment."[9]

In *Sapp's Realty*, BOLI adopted the following rule implementing that statute:

*"Harassment on the basis of religion is a violation of ORS 659.030. Unwelcome religious advances and other verbal or physical conduct of a religious nature constitute religious harassment when*:

"(1)   submission to such conduct is made, either explicitly or implicitly, a term or condition of the subject's employment;

"(2)   submission to or rejection of such conduct by the subject is used as the basis for employment decisions affecting the subject; *or*

"(3)   *such conduct has the* purpose or *effect of unreasonably interfering with the subject's work performance or creating an intimidating, hostile or offensive working environment." Id.* at 79 (emphasis added).

In *Sapp's Realty*, BOLI also "emphasize[d] that by adopting this test, this [agency] does not mean to state that general

---

[9] An anti-discrimination statute was first enacted in Oregon Laws 1947, chapter 508, many years earlier than Congressional adoption of the Equal Employment Opportunity Act. The stated purpose was to "safeguard [the] right to obtain and hold employment without discrimination." *Id.* at § 1. Such discrimination was declared an unlawful practice in words nearly identical to the present statute by Oregon Laws 1949, chapter 221, section 5.

expressions of religious beliefs at the workplace, by themselves, constitute a violation of ORS 659.030." *Id.* at 80. BOLI also analyzed the constitutional guarantees of free exercise of religion and free speech. *Id.* at 88-94.

BOLI's rule has been further interpreted in the present case. Four additional aspects of the *Sapp's Realty* rule, as further developed in this case, bear on the analysis.

(1) The "religious advances" or "other verbal or physical conduct of a religious nature" must be "sufficiently pervasive as to alter the conditions of employment." The employer's conduct will be examined to determine whether, from the objective standard of a "reasonable person," that conduct would actually create an "intimidating, hostile, or offensive working environment."

(2) The conduct must in fact be unwelcome to the employee. As to that factor, the test is subjective.

(3) The unwelcome conduct must have been directed at an employee because of that employee's religion.

(4) Within the meaning of the rule, "religion" for both employer and employee includes nonbelief, as well as belief.

The analysis below will consider BOLI's rule as so interpreted by BOLI.

## B. *Statutory Authority for BOLI's Rule*

■ The parties do not contend that BOLI lacks authority to promulgate rules[10] or that the rule in this case was promulgated in violation of applicable rulemaking procedures.[11] However, Judge Edmonds reasoned in his special concurrence below that the statute protects an employee from discrimination based on the *employee's* religion, whereas

---

[10] *See* ORS 659.103 (granting very broad rulemaking authority to BOLI).

[11] ORS 183.355(5) provides in part that, "if an agency, in disposing of a contested case, announces in its decision the adoption of a general policy applicable to such case and subsequent cases of like nature the agency may rely upon such decision in disposition of later cases." Accordingly, the method used by BOLI to announce the challenged rule in the course of exercising its adjudicatory authority in *Sapp's Realty* was permissible. *See Trebesch v. Employment Division*, 300 Or 264, 267-70, 710 P2d 136 (1985) (discussing when method may be used); *Marbet v. Portland General Electric*, 277 Or 447, 461, 561 P2d 154 (1977) (citing the quoted statute and holding that method may be used).

BOLI's rule permits a finding of discrimination when an employee is offended by an *employer's* expression of the *employer's* religious beliefs. 120 Or App at 285-86. Employer argues in this court that BOLI has, impermissibly, expanded the coverage of ORS 659.030(1), in three ways. First, Employer argues that the rule is written to cover "harassment" on the basis of religion, whereas the statutory prohibition against discrimination in terms, conditions, or privileges of employment does not include harassment. Second, Employer argues that the statute focuses on protecting the employee, while the rule focuses on conduct of the employer. Third, Employer argues that guarantees of freedom of religion do not protect nonbelief.

Under the applicable standard of review, each of those arguments is flawed. The standard is described in *Planned Parenthood*, which involved a rule challenge brought under ORS 183.400. This court's discussion of statutory authority in that context is pertinent in the present contested case proceeding, because Employer's argument is, in effect, that the way in which "the agency has erroneously interpreted a provision of law," ORS 183.482(8)(a), is that "the rule * * * [e]xceeds the statutory authority of the agency," ORS 183.400(4)(b). In *Planned Parenthood*, this court explained:

"The question, then, is whether [a rule] corresponds to the statutory policy as we understand it. * * *

"To the extent that the rule departs from the statutory policy directive, it 'exceeds the statutory authority of the agency' within the meaning of those words in ORS 183.400(4)(b). 'Authority' in that section cannot be taken to mean only the overall area of an agency's authority or 'jurisdiction,' because that construction would leave rules open to substantive review only for constitutional violations under ORS 183.400(4)(a). In effect, such an interpretation would expand every official's rulemaking power on matters within [the official's] general assignment to the limits of constitutional law, whatever the legislative policy of the statute might be. It would contradict the well-established principle to avoid constitutional holdings until it is clear that the challenged policy indeed has been enacted into law by the politically responsible lawmakers, in this case the Legislative Assembly.

"We do not think [that] this is what the legislature intended in enacting the 'exceeds statutory authority' language of ORS 183.400(4)(b). Rather we agree with [the following statement]:

" 'To resolve whether the challenged rule is within the statutory authority of the agency, this court need only determine whether the rule is within the range of discretion allowed by the more general policy of [the statute at issue].' " 297 Or at 573-74.

The court examined the policies expressed in the enabling statute in that case, including the "explicit[] * * * aim" of the statute, and determined that the rule in that case violated the agency's rulemaking authority. *Id.* at 574.[12] Here, however, the rule does not "depart[] from the statutory policy directive." *Id.* at 573.

With respect to Employer's first argument, "discriminat[ion] * * * in terms, conditions or privileges of employment," ORS 659.030(1)(b), includes the conduct covered by BOLI's rule. As discussed above, BOLI's rule requires all of the following: that the employer's conduct within one of the statutorily protected areas, such as religion, was so pervasive and severe that it altered the employee's working conditions for the worse to the extent that the conduct created an intimidating, hostile, or offensive working environment when viewed under an objective standard; and that the

---

[12] *PGE v. Bureau of Labor and Industries,* 317 Or 606, 859 P2d 1143 (1993), does not provide the appropriate framework for the issue presented. In *PGE,* the question was whether the express terms of a statute conflicted with the agency's rule; the court had to interpret what the legislature meant by that specific statute. Here, instead, the question is whether the agency's rule is within the broad, general delegation for rulemaking. In other words, *PGE* sets a method of analysis for situations in which the court is asked to interpret what the legislature has specified directly. Here, the court is asked instead to interpret what the legislature has specified in generalities, indirectly; the question is the scope of a broad delegation to an administrative agency for rulemaking. *See Springfield Education Assn. v. School Dist.,* 290 Or 217, 226-35, 621 P2d 547 (1980) (describing different kinds of legislative delegation to agencies and discussing whether an agency's interpretation coincides with the legislative policy that inheres in the meaning of the statute).

Nonetheless, the result would be the same using the *PGE* methodology. The text of ORS 659.030(1), read in context, covers the kind of conduct prohibited by BOLI's rule. *See PGE,* 317 Or at 610-12 (text and context are first level of analysis; no resort to legislative history or maxims of construction if first level clearly discloses legislative intent). Religious discrimination in "conditions" of employment includes acts of religious harassment.

employee actually suffered a detriment as a result of the conduct.

The psychological environment in which a person works is as much a part of working "conditions" as is the physical environment. (That is, the nature, quality, and manner of the relationship with one's employer is one of the terms, conditions, or privileges of a person's employment, some of which come within the categories protected by this civil rights statute, such as religion.) The "reasonable person" or objective standard contained in BOLI's rule is designed, at least in part, to ensure that there is objective evidence on which to base a finding of an actual alteration of those working conditions before BOLI will find a violation of the rule. The rule also requires that the employee have suffered a detriment — in other words, was discriminated against in those terms and conditions of employment. *See Webster's Third New Int'l Dictionary* 648 (unabridged ed 1993) ("discriminate" means "to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit").

Employer's second statutory argument also fails. ORS 659.030(1) focuses on the conduct of others in the workplace, including the employers' conduct, not just on the protection of employees from discriminatory conduct. ORS 659.030(1) defines as unlawful employment practices certain kinds of conduct engaged in *by employers*. The statute declares it unlawful "[f]or an employer" to discriminate. The rule in question likewise focuses on employers' conduct.

As to Employer's third argument, BOLI's rule comes squarely within the statutory directive to protect employees from discrimination "because of" the employee's religion. A causal connection is required by BOLI's rule. BOLI's rule, as interpreted in this case, is limited to situations in which the employer's discriminatory conduct is directed at an employee based on that employee's religious belief or nonbelief.

■ The term "religion" in the present context commonly includes a lack of such beliefs, as well as a belief-system of faith or worship practiced by a particular sect. *See Salem College & Academy, Inc. v. Emp. Div.*, 298 Or 471, 489, 695

P2d 25 (1985) ("Religious pluralism is at the historic core of American guarantees of religious freedom" and includes " 'persons of all religious denominations, as well as non-believers' " (quoting Judge Matthew P. Deady speaking at Oregon's constitutional convention in 1857));[13] *Dilger v. School District 24CJ*, 222 Or 108, 132, 352 P2d 564 (1960) (denial of atheist parent's right to excuse that parent's child from religious training "would probably be a violation of the freedom of religion guaranteed by both the Oregon and the United States Constitutions"); *see also Epperson v. Arkansas*, 393 US 97, 104, 89 S Ct 266, 21 L Ed 2d 228 (1968) ("The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." (footnote omitted)); Or Const, Art I, §§ 4-7 (no religious test to be required as qualification for office; no money to be appropriated for religious or theological institutions or for religious services in legislature; no religious qualification to be used for witnesses or jurors; oath or affirmation to be administered in manner most consistent with and binding upon conscience of person to whom administered).

There is no indication in ORS chapter 659 that the legislature used the term "religion" in a more restrictive sense when prohibiting employment discrimination on the basis of an employee's religion. In addition to being enacted against the foregoing background, ORS 659.030(1) covers categories occupied by every person. That is, every person has a race, color, national origin, marital status, and age; likewise, under this broad-brush statute, every person has a religion. All are to be protected from discrimination. Thus, the policy embodied in ORS 659.030(1) is one of prohibiting employment discrimination because of an individual's religion. BOLI's rule "corresponds to [that] statutory policy" and is "within the range of discretion allowed by" that policy. *See Planned Parenthood*, 297 Or at 573-74 (stating those tests just quoted).

---

[13] Oregon's territorial legislature enacted Sunday closing laws but exempted from them those who celebrated a different "Sabbath" day. When the state constitution was drafted, it protected religious "opinions" and "rights of conscience." Or Const, Art I, § 3 (quoted *post*).

## C. *Application of the Rule to the Facts*

■ Employer also argues that, even if the rule is valid because it is within BOLI's authority, there is insufficient evidence, as a matter of law, to permit BOLI to find as fact or to conclude that a reasonable person with Complainant's characteristics would have found this work environment to have been intimidating, hostile, or offensive. As did the Court of Appeals, 120 Or App at 276-77 & n 3, we disagree.

A reasonable person could find a work environment to be intimidating, hostile, or offensive in the totality of the circumstances presented here, including the characteristics of Complainant here. Those circumstances also included, it will be recalled, the employer's

— repeatedly inviting the employee to attend the employer's church;

— repeatedly telling the employee that he would go to hell because of his personal living situation and because of his nonattendance at church and calling the employee and members of the employee's family at home, with similar messages;

— telling the employee that a person could not be good at the employee's work unless the employee was a member of the same generic religious group as the employer and attended church, while informing the employee that the employer wanted to work with someone with a religious preference similar to that of the employer, because such people would not steal at work.

For the foregoing reasons, we conclude that Employer's subconstitutional arguments are not well taken. We turn, therefore, to the first of his state constitutional claims.

### ARTICLE I, SECTIONS 2 AND 3, OF THE OREGON CONSTITUTION

## A. *The BOLI Rule on Its Face*

■ Article I, section 2, of the Oregon Constitution, provides:

"All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences."

Article I, section 3, provides:

> "No law shall in any case whatever control the free exercise, and enjoyment of religeous (*sic*) opinions, or interfere with the rights of conscience."

These provisions are obviously worded more broadly than the federal First Amendment, and are remarkable in the inclusiveness and adamancy with which rights of conscience are to be protected from governmental interference. From our current vantage point of a society that is religiously diverse and *relatively* unconcerned about that diversity, it is difficult to fully appreciate why Oregon's pioneers approved these broad and adamant protections. However, the history of religious intolerance was fresh in the minds of those who settled Oregon, many of whom themselves represented relatively diverse religious beliefs. Reporting on 300 years of governmental intolerance enforced by criminal laws in England, Judge Stephen summarized:

> "I may observe in general that all opinions except those which were regarded as strictly correct, were pretty impartially punished. It was as dangerous to believe too much as not to believe enough — to be a Roman Catholic priest as to be a publisher of fanatical pamphlets." Sir James Fitzjames Stephen, II *History of the Criminal Law of England*, 426 (Macmillan ed 1883).

Under the criminal laws reported by Stephen, a person was fined for *not* attending the "Established Church" and imprisoned for attending "conventicles," or meetings, of any other persuasion. The last of these governmental acts of intolerance were *not* repealed until 1844, well into Queen Victoria's reign, *id.* at 483, just two years before the Oregon country became territory of the United States by an 1846 treaty between England and the United States. In fact, the law imposing a fine for failing to attend the "Established Church" was not repealed until 1846. *Ibid.*

The text of Article I, sections 2 and 3, and some of the historical circumstances surrounding its adoption, have been discussed in this court's case law. A starting point for examining the case law pertaining to those provisions is *Salem College*. In *Salem College*, this court considered the constitutionality of laws that exempted certain religious organizations, but not others, from taxation to fund unemployment

benefits for their workers. The court came to two central conclusions, the first of which is pertinent to the resolution of this case.

This court concluded, first, that the free exercise of religion and rights of conscience under Article I, section 2, of the Oregon Constitution, do not relieve religious schools from paying payroll taxes for unemployment insurance pursuant to a general statutory scheme imposing taxes for such insurance. *Salem College*, 298 Or at 489. The unemployment insurance statutes are not based on the religious character of the employing entity. *Id.* at 486. The court expressly rejected the formula suggested in that case of requiring a "compelling" state interest to be shown to validate the tax. *Id.* at 492. A court need not weigh the nature or degree of the state's interest to permit the regulation and participation of all employers, including religious organizations, in an unemployment insurance system. *Ibid.*[14]

This court in *Salem College* said several additional things of note. As stated earlier, that opinion implied that the prevailing view at the Oregon constitutional convention was that equal constitutional tolerance for various religious beliefs extends to religious believers and nonbelievers alike. *Id.* at 489. This court quoted with apparent approval from the Court of Appeals' decision in that case to the effect that the legislature cannot "infring[e] on the right of citizens to develop, independently, their own set of beliefs" or "discourag[e] the multiplicity of sects." *Ibid.* (quoting *Salem College & Academy, Inc. v. Emp. Div.*, 61 Or App 616, 628, 659 P2d 415 (1983)). The court followed through on that point by stating that, if a statutory exemption were to choose among religions or religious organizations, then all religions are not

---

[14] The *Salem College* court's second main conclusion was that, if the state elects to exempt religious schools from paying into the unemployment insurance system, then Article I, sections 2 and 3, of the Oregon Constitution, prohibit the state from discriminating among similar religious schools by virtue of their differing structural relationship with a church or other religious organization. 298 Or at 489. Referring to the proceedings of the Oregon constitutional convention, the court asserted that religious pluralism is at the core of America's and Oregon's guarantees of religious freedom and concluded, accordingly, that equality among the various "faiths and kinds of religious organizations" is implicit in Article I, sections 2 and 3. *Id.* at 488-89, 492, 495. That conclusion is not directly relevant to the resolution of this case, because the BOLI rule at issue treats all forms of religious belief and nonbelief in the same way.

equally "secure" to exercise their rights under Article I, sections 2 and 3. In such a case, the state may not excuse its uneven conduct by asserting " 'compelling' interests in order to discriminate between otherwise indistinguishable religious activities by their sectarian affiliations." *Id.* at 492.

This court ultimately upheld the statutory scheme to permit taxation of *all* schools, including religious schools of all types, and held that the statute, so interpreted, does not contravene Article I, sections 2 and 3, of the Oregon Constitution. *Id.* at 495.

■　　Under *Salem College*, a general statutory scheme regulating employers, such as the unemployment compensation program, is not subject to a valid challenge based on Article I, sections 2 and 3. In this case, the general regulation of employment discrimination is such a scheme. ORS chapter 659 and its implementing rules prohibit employers from treating employees in a discriminatory manner because of listed factors (such as race, sex, religion, and age) that generally are unrelated to job qualifications and work performance.

A general scheme prohibiting religious discrimination in employment, including religious harassment, does not conflict with any of the underpinnings of the Oregon constitutional guarantees of religious freedom identified in *Salem College*: It does not infringe on the right of an employer independently to develop or to practice his or her own religious opinions or exercise his or her rights of conscience, short of the employer's imposing them on employees holding other forms of belief or nonbelief; it does not discourage the multiplicity of religious sects; and it applies equally to all employers and thereby does not choose among religions or beliefs.

The law prohibiting religious discrimination, including religious harassment, honors the constitutional commitment to religious pluralism by ensuring that employees can earn a living regardless of *their* religious beliefs. The statutory prohibition against religious discrimination in employment and, in particular, the BOLI rule at issue, when properly applied, will promote the "[n]atural right" of employees to "be secure in" their "worship [of] Almighty God

according to the dictates of their own consciences," Or Const, Art I, § 2, and will not be a law controlling religious rights of conscience or their free exercise.

■ The next case to arise under Article I, sections 2 and 3, added something to the state constitutional analysis. In *Smith v. Employment Div.*, 301 Or 209, 721 P2d 445 (1986), *vacated and remanded on other, unrelated grounds*, 485 US 660, 108 S Ct 1444, 99 L Ed 2d 753 (1988), Smith was denied state unemployment benefits after he was fired from his job as a drug counselor for using peyote in disregard of his employer's express requirement that he be drug free. He asserted that the use was a religious practice. That use also violated a state criminal law, but the decision was about Smith's disqualification for unemployment benefits because of job-related misconduct. The validity of the discharge was not at issue; only the constitutionality of the denial of unemployment benefits was before the court. This court held that there was no state constitutional violation, reiterating the salient portions of *Salem College* to the effect that the law denying unemployment benefits for a misconduct-based discharge is part of a general regulatory scheme and is "completely neutral toward religious motivations for misconduct." *Smith*, 301 Or at 215.

The *Smith* court then stated that, "[a]s long as disqualification by reason of the religiously based conduct is peculiar to the particular employment and most other jobs remain open to the worker, we do not believe that the state is denying the worker a vital necessity in applying the 'misconduct' exception of the unemployment compensation law." *Id.* at 216. That passage appears to mean that the application of a neutral law to misconduct that is being justified as a religious practice does not burden the actor's religious freedoms unconstitutionally where such application does not foreclose the actor's enjoyment or exercise of that religious practice. *Smith* thus reinforced the position announced in *Salem College*: A law that is neutral toward religion or nonreligion as such, that is neutral among religions, and that is part of a general regulatory scheme having no purpose to control or interfere with rights of conscience or with religious opinions does not violate the guarantees of religious freedom in Article I, sections 2 and 3.

*Smith* also went further than *Salem College*, which did not involve a religious practice. The element that *Smith*

added to *Salem College* — the denial of a challenge to a neutral law that, under certain factual circumstances, has an impact on a religious practice — is crucial in the context of this case.[15]

We conclude that, under established principles of state constitutional law concerning freedom of religion, discussed above, BOLI's rule is constitutional on its face. The law prohibiting employment discrimination, including the regulatory prohibition against religious harassment, is a law that is part of a general regulatory scheme, expressly neutral toward religion as such and neutral among religions. Indeed,

---

[15] This court has decided two additional cases under Article I, sections 2 and 3, but they are off the point of the issue before us.

In *Cooper v. Eugene Sch. Dist. No. 4J*, 301 Or 358, 723 P2d 298 (1986), *appeal dismissed* 480 US 942 (1987), this court analyzed the constitutionality of a statute prohibiting public school teachers from wearing "any *religious* dress." The court upheld the statute after construing it to prohibit only the wearing of religious dress as a regular or frequently repeated practice while teaching in the public school. 301 Or at 381. Unlike the unemployment compensation law considered in *Smith*, the statute at issue in *Cooper* was "not a general regulation, neutral toward religion on its face and in its policy"; instead, the statute "single[d] out a teacher's religious dress because it is religious and to the extent that its religious significance is apparent." *Id.* at 368-69. In addition to limiting directly a religious practice, the statute in *Cooper* did not apply equally to all religions, but had an impact on only those religions whose practices prescribe the wearing of religious dress (such as but not limited to the Sikh teacher in *Cooper*, certain Islamic adherents, traditional Jews, and certain Roman Catholic priests and nuns). *Id.* at 360, 369, 371-72. The BOLI rule at issue here does not expressly or necessarily limit any religious practice, and it does not discriminate among religions. Accordingly, *Cooper* does not provide guidance here.

BOLI relies on *Cooper* in the present case, but misses its point about the circumstances under which a governmental restriction on governmental conduct may be permitted. *Cooper* is a case of an agent of the government dramatically espousing a specific religious belief to an audience made captive by other acts of the government. It is about the government restricting itself from such advocacy by restricting its agent while acting in an official, governmental capacity. But in this case, there is no overt religious symbolism expressed or supported by the government. In *Cooper*, the prohibition was upheld because it could be limited to "actual incompatibility with the [public school] teaching function." *Id.* at 378.

In *Employment Div. v. Rogue Valley Youth for Christ*, 307 Or 490, 770 P2d 588 (1989), this court considered a challenge to a statute requiring religious organizations that were *not* churches to pay unemployment compensation taxes. A local organization claimed that it was constitutionally exempt from paying taxes because of its religious purpose. The court construed Oregon's unemployment compensation taxation scheme so as to treat all religious organizations equally and, as so construed, upheld it. *Id.* at 499. Before that construction, the statute in that case could be read to discriminate among types of religious organizations. By contrast, here, the challenged BOLI rule does not differentiate among religions. Therefore, *Rogue Valley* is not on point.

its purpose is to support the values protected by Article I, sections 2 and 3, not to impede them.

## B. *The Reach of the BOLI Rule*

■ The statute empowers the agency to punish on-the-job discrimination that is based on religion; it does not empower agency prohibition or punishment of on-the-job religious practices. Discrimination is the key, that is, discrimination that is not itself protected by the state constitution.

In the present case, Employer raised an affirmative defense, based on the rights of conscience and religious practices guaranteed by Article I, sections 2 and 3, to excuse violation of the BOLI rule. Employer argued that his conduct was constitutionally privileged even if it violated a statutorily authorized rule that is constitutionally valid on its face. BOLI found, at least implicitly, that Employer's conduct,[16] which violated its rule, constituted a religious practice. BOLI found expressly that Employer had no knowledge that his religious practice created an intimidating, hostile, or offensive working environment. The question is whether Employer is entitled under that circumstance to prevail on his defense.

■ *Smith* contains an additional — if less explicit — requirement: A person against whom a sanction is to be imposed for conduct that constitutes a religious practice must *know* that the conduct causes an effect forbidden by law. In *Smith*, this court regarded it as significant that Smith had received a memorandum from his employer stating its policy against employees' use of drugs and had been told by his employer that ingestion of peyote would result in his termination as a drug counselor. 301 Or at 211-12. The court noted that Smith knew that he was ingesting peyote and knew that he was violating his employer's work rule (although there is no indication whether he knew that his conduct had a particular legal significance under the unemployment compensation law). *Id.* at 215-16.

---

[16] Here, BOLI has applied the *Sapp's Realty* rule to a situation in which the conduct in question was engaged in by the employer personally. We need not and do not consider how to analyze a situation in which an employee seeks to impose vicarious liability for the conduct of persons other than the employer (such as coworkers).

■     In the present case, BOLI requires for a violation of its rule that the employer act because of the employee's religion or nonreligion. However, BOLI has declined to include any subjective component related to the employer within its anti-harassment rule where the conduct of the employer constitutes a religious practice. Rather, BOLI's objective standard imposes liability when an employer *should have known* that its conduct causes a specified forbidden effect, whether or not the employer actually did know.[17] Under the reasoning of *Smith*, more is required. When a person engages in a religious practice, the state may not restrict that person's activity unless it first demonstrates that the person is consciously aware that the conduct has an effect forbidden by the law that is being enforced. (That principle does not mean that the state must show that the person understands the legal conclusion that the activity violates a law or appreciates subjectively or morally that the conduct is wrong.) With respect to an employer whose activity that violates BOLI's rule constitutes a religious practice, as is the case here, the employer must know that that activity created an intimidating, hostile, or offensive working environment.[18] Where religious practice is involved, BOLI's assertion that state constitutional religious values are adequately protected by using a reasonable person's perspective and reaction to the activity is erroneous.

■     The agency's use of a reasonable person standard to provide some relevant evidence as to an employer's knowledge that his activity is harming others is, in itself, unremarkable. In its quest for the facts upon which a contested case may depend, an administrative agency need not eschew logic. That is not the problem in this case. The agency expressly found that Employer did not know that his activity

---

[17] The agency bases its decision on the proposition that the moral comments, expressions, and invitations in this case were such that a reasonable person "would know or should know" they would offend workers.

[18] Employer argues that BOLI must find that such an employer *intended* to create an intimidating, hostile, or offensive working environment or, in the alternative, that BOLI must find that the employee placed the employer on notice by complaining explicitly to the employer. Those are two possible ways to demonstrate that an employer knew that its conduct created an intimidating, hostile, or offensive working environment, but they are not the only two ways that such knowledge may be proved, either directly or circumstantially. We decline to limit the means by which such knowledge may be proved by BOLI or gained by the employer.

made the workplace intimidating, hostile, or offensive as to this employee or any employee. That is the operative fact in this case, whether or not a reasonable person might have inferred otherwise. Because sections 2 and 3 of Article I are expressly designed to prevent government-created homogeneity of religion, the government may not constitutionally impose sanctions on an employer for engaging in a religious practice without knowledge that the practice has a harmful effect on the employees intended to be protected. If the rule were otherwise, fear of unwarranted government punishment would stifle or make insecure the employer's enjoyment and exercise of religion, seriously eroding the very values that the constitution expressly exempts from government control.

## CONCLUSION

Fairly read, BOLI's revised final order found that Employer's actions, in violation of its rule, constituted a religious practice.[19] BOLI also expressly found that Employer did not know that his conduct created an intimidating, hostile, or offensive working environment. That being so, Employer established an affirmative defense under Article I, sections 2 and 3.[20]

BOLI's rule, challenged in this case, does not exceed the scope of the authorizing statute. The facts found by BOLI permitted it to conclude that Employer's conduct violated the rule. On its face, the challenged rule does not offend Article I, sections 2 or 3, of the Oregon Constitution, in the manner argued by Employer. However, the rule offends Article I, sections 2 and 3, by not requiring that BOLI find that Employer knew in fact that his actions in exercise of his religious practice had an effect forbidden by the rule.

The decision of the Court of Appeals is affirmed. The revised final order of the Bureau of Labor and Industries is

---

[19] Conduct that may be motivated by one's religious beliefs is not the same as conduct that constitutes a religious practice. The knowledge standard is considered here only in relation to the latter category. In this case, no distinction between those categories is called into play, because a fair reading of BOLI's revised final order is that BOLI found that all of Employer's religious activity respecting Complainant is part of Employer's religious practice.

[20] Because Employer obtains complete relief under Article I, sections 2 and 3, of the Oregon Constitution, we need not consider his remaining constitutional arguments.

reversed, and the case is remanded to that agency with instructions to dismiss the complaint.

**UNIS, J.,** specially concurring.

I agree with the result reached by the majority in this case. However, I would reach that result under Article I, section 8, of the Oregon Constitution,[1] Oregon's constitutional guarantee of free expression, rather than under Article I, sections 2 and 3, of the Oregon Constitution,[2] which is the basis of the majority's opinion.

This court's "free expression of opinion" and "right to speak" jurisprudence under Article I, section 8, of the Oregon Constitution consists of a four-part inquiry that is described in detail in *In re Fadeley*, 310 Or 548, 574-78, 802 P2d 31 (1990) (Unis, J., concurring in part, dissenting in part). "The first inquiry in our assessment whether a governmental enactment violates Article I, section 8, * * * is whether that enactment *on its face* restrains the 'free expression of opinion' or restricts the 'right to speak' on any subject whatever." *Id.* at 575 (emphasis in original); *State v. Moyle*, 299 Or 691, 695, 705 P2d 740 (1985); *see also State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982) (quoting *State v. Spencer*, 289 Or 225, 228, 611 P2d 1147 (1980)).

"If the enactment restrains the 'free expression of opinion' or restricts the 'right to speak,' then a second inquiry is necessary."[3] *In re Fadeley*, 310 Or at 575 (Unis, J., concurring in part, dissenting in part). That inquiry is whether the restraint or restriction (a) was well established when the first American guarantees of freedom of speech were adopted

---

[1] Article I, section 8, of the Oregon Constitution provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[2] Article I, section 2, of the Oregon Constitution provides:

"All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences."

Article I, section 3, provides:

"No law shall in any case whatever control the free exercise, and enjoyment of religeous (sic) opinions, or interfere with the rights of conscience."

[3] If the law does not, on its face, implicate speech, the court must scrutinize whether the application of the law to a particular defendant violates Article I, section 8, of the Oregon Constitution. *See City of Eugene v. Miller*, 318 Or 480, 492-99, 871 P2d 454 (1994) (Unis, J., specially concurring).

and (b) is one that those guarantees demonstrably were not intended to abolish. *State v. Henry*, 302 Or 510, 514, 521, 732 P2d 9 (1987). If the government demonstrates that the enactment falls within such an established exception, then the enactment does not, on its face, violate Article I, section 8. *Moyle*, 299 Or at 695; *Robertson*, 293 Or at 412. In that event, this court will scrutinize the enactment to determine whether it appears to reach privileged "expression of opinion" or "speech," or "whether it can be interpreted to avoid such overbreadth." *Moyle*, 299 Or at 702 (quoting *Robertson*, 293 Or at 418). If the court is able to discern the intended boundaries of an overbroad law, this court will narrow the law to the constitutional confines intended by the lawmakers. *Moyle*, 299 Or at 702-05. "If the [enactment] potentially reaches substantial areas of communication that would be constitutionally privileged and that cannot be excluded by a narrowing interpretation or left to a case-by-case defense against the application of the [enactment], it [is] unconstitutional." *Id.* at 701-02.

If the enactment does not restrain or restrict speech historically intended to be excepted from Article I, section 8, a third inquiry is necessary. "That question is whether the focus of the enactment, as written, is on an identifiable, actual effect or harm that may be proscribed, rather than on the communication itself." *In re Fadeley*, 310 Or at 576 (Unis, J., concurring in part, dissenting in part); *see Moyle*, 299 Or at 697; *see also Oregon State Police Assn. v. State of Oregon*, 308 Or 531, 541, 783 P2d 7 (1989) (Linde, J., concurring) ("law must specify expressly or by clear inference what 'serious and imminent' effects it is designed to prevent"), *cert den* 498 US 810 (1990). An enactment "directed at an *effect* of speech may be constitutional, unless the statute is overbroad." *Oregon State Police Assn.*, 308 Or at 536. If the enactment identifies the actual harm in its text, rather than prohibiting or restricting the use of words, then the law will not be held, on its face, to violate Article I, section 8. Instead, it will be scrutinized to determine whether it appears to reach protected communications or whether it can be interpreted narrowly to limit its reach to situations in which harm occurs and, thus, to avoid such overbreadth. If the answer to the third inquiry is that the enactment proscribes expression or the use of words, rather than harm, it violates Article I, section 8, unless there is a claim that infringement

on otherwise constitutionally protected speech is justified under the "incompatibility exception" to Article I, section 8.[4]

Before applying the foregoing methodology to this case, it is crucial to understand the enactment to which it will be applied. ORS 659.030(1) provides in part:

"[I]t is an unlawful employment practice:

"\* \* \* \* \*

"(b) For an employer, because of an individual's \* \* \* religion \* \* \* to discriminate against such individual in compensation or in terms, conditions or priviliges of employment."

In *In the Matter of Sapp's Realty*, No. 11-83 (BOLI 1985), the Bureau of Labor and Industries (BOLI) adopted the following rule implementing that statute:

"Harassment on the basis of religion is a violation of ORS 659.030. Unwelcome religious advances and other verbal or physical conduct of a religious nature constitute religious harassment when:

"(1) submission to such conduct is made, either explicitly or implicitly, a term or condition of the subject's employment;

"(2) submission to or rejection of such conduct by the subject is used as the basis for employment decisions affecting the subject; or

"(3) such conduct has the purpose or effect of unreasonably interfering with the subject's work performance or creating an intimidating, hostile or offensive working environment." *Id.* at 79.

---

[4] In that event, a fourth inquiry must be addressed. The fourth inquiry is whether the speech that may not constitutionally be prohibited outright is, nevertheless, incompatible with the performance of one's special role or function. This court has recognized that there are some activities that lawmakers could not forbid citizens generally from doing, but that they may declare to be incompatible with the role and work of a public official. *See, e.g., In re Lasswell*, 296 Or 121, 673 P2d 855 (1983) (professional disciplinary rule survived the accused's constitutional challenge, because this court narrowly interpreted it so as to limit its coverage, in the words of Article I, section 8, to a prosecutor's "abuse" of the "right to speak, write, or print freely on any subject whatever"). An enactment that infringes on speech, and that is not justified under the "incompatibility exception," cannot survive an Article I, section 8, challenge. This case does not implicate the "incompatibility exception."

BOLI's rule has been further interpreted in the present case. Under BOLI's present interpretation, the "religious advances" or "other verbal or physical conduct of a religious nature" must be "sufficently pervasive as to alter the conditions of employment." The employer's conduct will be examined to determine whether, from the objective standard of a "reasonable person," that conduct would create an "intimidating, hostile or offensive working environment." The conduct must be unwelcome on the part of the employee. Additionally, the unwelcome conduct must have been directed at the employee because of the employee's religion.

BOLI's interpretations of the statute are rules implementing that statute. *See* ORS 183.310(8) (defining a "rule" as "any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy"); ORS 183.355(5) ("if an agency, in disposing of a contested case, announces in its decision the adoption of a general policy applicable to such case and subsequent cases of like nature [*i.e.*, a rule], the agency may rely upon such decision in disposition of later cases"). The rules have the effect of statutory law. *Bronson v. Moonen*, 270 Or 469, 476, 528 P2d 82 (1974). Thus, for purposes of analysis under Article I, section 8, BOLI's interpretation of ORS 659.030(1) in *Sapp's Realty* and in this case is the "law" that we must analyze under Article I, section 8.

This case, therefore, essentially involves a law that provides:

"An employer commits an unfair labor practice if the employer, because of an employee's religion, makes religious advances and other physical or verbal conduct that are

"(1)   in fact unwelcome by the employee; and

"(2)   have the purpose or effect of

"(a)   unreasonably interfering with the subject's work performance; or

"(b)   creating a working environment that a reasonable person would find intimidating, hostile, or offensive."

Applying this court's established methodology to the present case, it is obvious that BOLI's rule, on its face, restrains the "free expression of opinion" or restricts the "right to speak." The rule, by its terms, proscribes certain "verbal conduct" and "religious advances." It is equally clear

that BOLI has not demonstrated that the rule's prohibition against certain "verbal conduct" and "religious advances" is within a well-established, historical exception to the constitutional protection afforded free expression by Article I, section 8.

I, therefore, turn to the third inquiry in our analysis under Article I, section 8 — namely, whether the focus of the enactment, as written, is on an identifiable actual effect or harm that may be proscribed, rather than on the communication itself. At first glance, BOLI's rule appears to be directed at an identifiable harm — namely, the creation of an intimidating, hostile or offensive working environment. However, BOLI's rule further defines what is meant by an "intimidating, hostile or offensive" working environment in *objective* terms, *i.e.*, whether a reasonable person would find the religious speech to be intimidating, hostile or offensive. There is no requirement in BOLI's rule that anyone in fact feel intimidation, hostility or offense.

In *Moyle*, 299 Or at 699, this court recognized that "[a] difficulty arises * * * when a statute defines a [prohibition] in terms of causing a kind of harm which necessarily results only from speech or writing, so that the statutory definition is only the other side of the coin of a prohibition of the speech or writing itself." This court stated:

"Some kinds of prohibitions may violate Article I, section 8, even if written in terms of 'harms' rather than speech or writing. The constitutional prohibition against laws restraining speech or writing cannot be evaded simply by phrasing statutes so as to prohibit 'causing another person to see' or 'to hear' whatever the lawmakers wish to suppress." *Id.*

In my view, BOLI's rule — by measuring an intimidating, hostile or offensive working environment by a purely objective standard — is not directed at an identifiable actual harm or effect, but at expression itself. The rule can be violated without any actual harm or effect taking place. A violation of BOLI's rule occurs when an employer engages in religious expression of certain content (*i.e.*, expression that a reasonable person would find to create an intimidating, hostile or offensive working environment), even if no worker is,

in fact, made to feel the proscribed effects.[5] In essence, the rule bans the use of certain expression because the government believes that that expression will have a tendency to cause a particular effect or harm. This approach to lawmaking is what Article I, section 8, prohibits: "Our cases under Article I, section 8, preclude using apprehension of unproven effects as a cover for suppression of undesired expression, because they require regulation to address the effects rather than the expression as such." *City of Portland v. Tidyman*, 306 Or 174, 188, 759 P2d 242 (1988).

For the foregoing reasons, I conclude that BOLI's rule violates the "free expression of opinion" and "right to speak" guaranteed by Article I, section 8, of the Oregon Constitution.

---

[5] I recognize that BOLI's rule requires that the religious advances in fact be unwelcome from the subjective standpoint of the employee. This does not mean that the expression will necessarily create actual intimidation, hostility or offense, however. Thus, the only *actual* "harm" at which BOLI's rule is directed is being subjected to unwelcome offensive speech in the workplace. Such a harm is not proscribable under Article I, section 8.