Argued and submitted April 8, Madras High School, Madras, affirmed September 23, on petitioner Blachana, LLC's petition for reconsideration filed October 7, allowed by opinion November 25, 2015
See 275 Or App 46, 362 P3d 1210 (2015)

BLACHANA, LLC,
dba Twilight Room Annex,
aka The P Club;
and Christopher Penner,
*Petitioners,*

*v.*

OREGON BUREAU OF
LABOR AND INDUSTRIES,
*Respondent.*

Oregon Bureau of Labor and Industries
2513; A155228

359 P3d 574

Jonathan M. Radmacher argued the cause for petitioners. With him on the briefs was McEwen Gisvold LLP.

Leigh A. Salmon, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

TOOKEY, J.

**TOOKEY, J.**

The Rose City T-Girls is an informal social group that includes straight people, married couples, nonmarried couples, males who identify as females, cross-dressers, males who have physically transitioned to females, lesbians, and gay males. Respondents,[1] Blachana, LLC, and Christopher Penner, own and manage a bar in North Portland formerly known as the P Club.[2] Respondents seek judicial review of an order of the Commissioner of the Bureau of Labor and Industries (BOLI) concluding that they denied equal accommodations to the T-Girls at the P Club because of their sexual orientation, in violation of ORS 659A.403,[3] ORS 659A.406,[4] and ORS 659A.409,[5] when Penner left two

---

[1] In accordance with our rule governing the designation of parties in briefs, ORAP 5.15, we refer to Blachana, LLC, and Penner as respondents because they were respondents in the proceedings below.

[2] Blachana, LLC, owns the P Club, later known as the Twilight Room Annex. Penner is a member of Blachana, LLC, and manages the P Club.

[3] ORS 659A.403 provides:

"(1) Except as provided in subsection (2) of this section [(which does not apply here)], all persons within the jurisdiction of this state are entitled to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, without any distinction, discrimination or restriction on account of * * * sexual orientation[.]

"* * * * *

"(3) It is an unlawful practice for any person to deny full and equal accommodations, advantages, facilities and privileges of any place of public accommodation in violation of this section."

BOLI has defined "sexual orientation" to mean

"an individual's actual or perceived heterosexuality, homosexuality, bisexuality, or gender identity, regardless of whether the individual's gender identity, appearance, expression or behavior differs from that traditionally associated with the individual's assigned sex at birth."

OAR 839-005-003(16). That provision has been renumbered since the relevant time; however, because its text remains the same, we cite the current version.

[4] ORS 659A.406 provides, with an exception not relevant here, that

"it is an unlawful practice for any person to aid or abet any place of public accommodation, as defined in ORS 659A.400, * * * to make any distinction, discrimination or restriction on account of * * * sexual orientation[.]"

[5] ORS 659A.409 provides, with exceptions not relevant here, that

"it is an unlawful practice for any person acting on behalf of any place of public accommodation as defined in ORS 659A.400 to publish, circulate, issue or display, or cause to be published, circulated, issued or displayed, any communication, notice, advertisement or sign of any kind to the effect that any of the accommodations, advantages, facilities, services or privileges of the

voicemails for Cassandra Lynn, the founder of the T-Girls, in which he asked Lynn and the T-Girls not to come back to the P Club on Friday nights. Respondents challenge BOLI's conclusion that they violated ORS 659A.403 and ORS 659A.409 and contend that BOLI's order violated their rights under Article I, section 8, of the Oregon Constitution.[6] Because all of respondents' arguments are unpreserved, undeveloped, or unavailing in light of BOLI's factual findings, we affirm.

Because respondents do not challenge BOLI's findings of fact, those findings are the facts for purposes of judicial review. ORS 183.482(7) ("[T]he court shall not substitute its judgment for that of the agency as to any issue of fact * * *."); *Meltebeke v. Bureau of Labor and Industries*, 322 Or 132, 134, 903 P2d 352 (1995). The T-Girls gather regularly on Friday nights. They began frequenting the P Club on Friday nights around July 2010, when they were asked not to gather at another club where they had previously met. "Between September 2010 and January 2011, the T-Girls gathered intermittently on Friday nights at the P Club as they explored possible new Friday gathering spots. In January 2011, the T-Girls decided to make the P Club their 'regular Friday nightspot.'" "From eight to 54 T-Girls gathered at the P Club every Friday night between January 2011 and June 18, 2012." As BOLI explained in the final order:

"On June 18, 2012, Penner telephoned C. Lynn and left the following voicemail message:

"'Hello, my name is Chris, I'm the owner of the P Club Bar and Grill on North Lombard. Um, unfortunately, uh due to circumstances beyond my control I am going to have to ask for you, Cass, and your group not to come back on Friday nights. Um, I really don't like having to do that but unfortunately it's the area we're in and it's hurting business a lot. If you have any questions, please feel free to give me a call * * *. Again I'm really sorry about having to do this but yeah give me a call. Thanks, bye.'

---

place of public accommodation will be refused, withheld from or denied to, or that any discrimination will be made against, any person on account of * * * sexual orientation[.]"

[6] Article I, section 8, provides, "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

"In response to Penner's voicemail, C. Lynn telephoned Penner and left a message asking what the 'real reason' was for Penner's request that the T-Girls not come back on Friday nights.

"On June 21, Penner telephoned C. Lynn and left the following voicemail message:

"'Hello Cassandra, this is Chris from the P Club. Sorry it took me awhile to return your phone call. There is no underlying reason for asking you folks not to come back other than money. Um, sales on Friday nights have been declining at the bar for the last 18 months. Uh, about a year ago I was looking at asking you folks not to come in anymore and the girls said, "No, no, no don't," so I gave it a while longer. Um, I own another bar in north Portland; sales are doing great on Fridays, and so I've done some investigating as to why my sales are declining and there's two things I keep hearing: People think that (a) we're a tranny bar or (b) that we're a gay bar. We are neither. People are not coming in because they just don't want to be there on a Friday night now. In the beginning sales were doing fine but they've been on a steady decrease so I have to look at what the problem is, what the reason is, and take care of it; that's my job as the owner. So unfortunately, I have to do what I have to do and that is the only reason. It's all about money. So I'll be back in town tonight; if you want to give me a call I should be answering my phone; I've been out of town for the past few days. So, there we are, take care. Bye bye.'

"C. Lynn understood Penner's voicemails to mean that the P Club 'wasn't a tranny bar' and 'we're not allowed in there.'

"None of the aggrieved persons[, who are all members of the T-Girls,] visited the P Club after June 18, 2012."

(Paragraph numbers, footnotes, and citations omitted.) "After C. Lynn received the voicemails, she posted a note on the T-Girls' website stating that Penner had asked the T-Girls not to come back to the P Club. Subsequently, she posted a transcription of the voicemails, [and] then the actual voicemails[,] on the website." The 11 aggrieved persons in this case are members of the T-Girls who attended the Friday night gatherings before June 18, 2012, learned of and eventually heard the voicemails through Lynn and the T-Girls'

website, and did not return to the P Club because of the voicemails.

On November 18, 2011, after the commissioner filed a complaint against respondents and BOLI's Civil Rights Unit found substantial evidence to support the complaint, BOLI formally charged both respondents with violating ORS 659A.403(3) and ORS 659A.409, and also charged Penner with violating ORS 659A.406 by aiding and abetting Blachana. BOLI sought damages of "at least $50,000" for each of the aggrieved persons and a civil penalty of $1,000 per violation against each respondent. After resolving discovery disputes that are not relevant to this appeal, an administrative law judge (ALJ) employed by BOLI heard the case in May 2013.

Because our resolution of respondents' contentions on review turns on their arguments before BOLI, we explain those arguments in some detail. Before doing so, however, we provide some background on the Supreme Court's interpretation of Article I, section 8.

In *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982), the Supreme Court established three categories for analyzing a law under Article I, section 8. The court recently summarized those categories as follows:

"Under the first category, the court begins by determining whether a law is written in terms directed to the substance of any opinion or any subject of communication. If it is, then the law is unconstitutional, unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach. If the law survives that inquiry, then the court determines whether the law focuses on forbidden effects and the proscribed means of causing those effects include speech or writing, or whether it is directed only against causing the forbidden effects. If the law focuses on forbidden effects, and the proscribed means of causing those effects include expression, then the law is analyzed under the second *Robertson* category. Under that category, the court determines whether the law is overbroad, and, if so, whether it is capable of being narrowed. If, on the

other hand, the law focuses only on forbidden effects, then the law is in the third *Robertson* category, and an individual can challenge the law as applied to that individual's circumstances."

*State v. Babson*, 355 Or 383, 391, 326 P3d 559 (2014) (citations, internal quotation marks, and brackets omitted).

We return to respondents' arguments before BOLI. In their answer to the formal charges, respondents asserted a constitutional affirmative defense based on Article I, section 8. In their case summary, submitted before the hearing, they argued that they "have a right under Article I, section 8, of the Oregon Constitution to 'speak freely * * * on any subject whatever.' Application of ORS 659A.400, *et seq*, in this case, violates Respondents' rights thereunder."[7]

The ALJ allowed the parties to submit memoranda on that defense after the hearing. In its memorandum, BOLI argued that, under the *Robertson* framework, ORS 659A.403 is directed against causing forbidden effects rather than expressly or obviously proscribing expression, that is, that the statute does not fall into the first *Robertson* category. Furthermore, BOLI asserted, because the provision does not mention speech, it falls into the third *Robertson* category and, accordingly, is not subject to facial challenges. BOLI further contended that ORS 659A.403 was not unconstitutional as applied to respondents because respondents were being punished only "because [respondents] committed the proscribed act of affirmatively barring the T-Girls from the club on the basis of their sexual orientation." BOLI explained that respondents' argument—that they were being sanctioned based on the content of Penner's speech—"misconstrues the distinction between the content of speech impermissibly forming an element of an offense,

---

[7] Respondents supported that text with the following citations:

"*State v. Johnson*, 345 Or 190, 191 P3d 665 (2008) (striking down statute that restrained 'abusive speech'); *State v. Ciancanelli*, 339 Or 282, 121 P3d 613 (2005) (striking down statutes that restrained nude dancing); *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982) (striking down anti-coercion statute). *See State v. Stone*, 84 Or App 575, 578, 735 P2d 7, *rev den*, 303 Or 700 (1987) (describing how legislative revisions to the anti-coercion statute passed constitutional muster because they required that the 'fear' instilled by words be objectively reasonable, the physical injury feared is objectively reasonable, and a specific person to be harmed is identified)."

and using the content of speech to prove an element of an offense. The former may be unconstitutional, the latter is not. *See State v. Plowman*, 314 Or 157, 167, [838 P2d 558 (1992)]."

In their response, respondents asserted that they "had a right to express their desire—motivated by business interest—that the Rose City T-Girls no longer meet at Respondents' place of business on Friday nights." Rather than addressing ORS 659A.403, ORS 659A.406, or ORS 659A.409 under the *Robertson* framework, they argued that Penner's voicemail messages were less serious than the types of speech—including threats and demands—that were prohibited under the coercion statute at issue in *Robertson*. Respondents contended:

> "It cannot be disputed that Respondents did not demand anything. It cannot be disputed that Respondents did not threaten anything. And while some of the witnesses testified that they interpreted those words as a denial of service, it clearly was <u>not</u> a denial of service—no one came and attempted to be served. The refusal to return to Respondents' place of business, as the witnesses described it, was due to their anger at Respondents.

> "Or to put it a different way, Respondents did not refuse to provide service to anyone. Respondents' request that the group not return amounted to the free expression of Respondents' desire that the group stop coming on Friday nights. Respondents had a constitutional right to express that desire. Unless or until Respondents refused service— they did not and would not have—Respondents' statements cannot be used to punish them, as the Commissioner seeks to do."

(Underscoring in original.)

In its reply, BOLI argued that respondents had misunderstood the holding of *Robertson*—specifically, it contended that *Robertson* "is directed toward statutory construction and facial challenges to laws, not to what types of speech may or may not ever form the basis of an adverse state action." BOLI also argued:

> "A review of the key factual disputes in this case illustrates that ORS 659A is constitutional as applied to this

case. Respondents claim that the voice messages were only an 'expression of desire.' The Agency claims that the voice messages were denials of service. A denial of service may be sanctioned under ORS 659A; an 'expression of desire' likely would not be. Sanctioning a denial of service is constitutional; sanctioning an 'expression of desire' is generally not. If a fact finder rules in favor of the Agency that, as a matter of fact, the voice messages were denials of service, ORS 659A may be constitutionally enforced. If a fact finder rules in favor of Respondents that the voice messages were not denials of service, then ORS 659A may not be applied to the case and, therefore, there can be no constitutional issue.

"In short, if the facts are as Respondents say they are, it would be unconstitutional for the state to take adverse action against Respondents. The Agency agrees with Respondents on that point. However, the agency points out that ORS 659A could not (by its own terms) be applied to this case if the facts are as Respondents claim they are. The constitutional issues raised by Respondents only serve to outline the contours of ORS 659A's application and to frame the factual determination upon which this matter actually hinges."

The ALJ issued a proposed order in which it concluded that respondents had violated ORS 659A.403 and ORS 659A.406, but not ORS 659A.409. Both parties submitted objections.

BOLI then issued a final order in which it concluded that respondents had violated ORS 659A.403, ORS 659A.406, and ORS 659A.409. It found that "[a]ll of the aggrieved persons listened to the voicemails and understood Penner's voicemails to be a message that the T-Girls were not welcome in the P Club any night of the week because Penner thought their presence was causing customers to perceive the P Club as a 'tranny' club or gay bar." It also noted, "[T]he forum interprets Penner's request for the T-Girls 'not to come back' on Friday nights as a statement that they were not welcome at the P Club on Friday nights, the same conclusion reached by the aggrieved persons."

Based on that interpretation of the voicemails, BOLI concluded that they constituted a denial of equal accommodations to the aggrieved persons under ORS 659A.403.

Contrary to respondents' arguments, BOLI concluded that the aggrieved persons were not required to visit the P Club and request to be served in order to be denied equal accommodations. Rather, Penner's statements, which meant that the aggrieved persons were not welcome at the P Club on Friday nights, constituted a denial in themselves. BOLI also concluded that the denial was "'on account' of the T-Girls' sexual orientation."

As to ORS 659A.409, BOLI concluded that Penner had "issue[d]" a "notice" and "communication" by leaving the voicemails for Lynn. It noted that, although BOLI has been delegated statutory authority to define those terms by rule, it has not done so. After considering dictionary definitions, it concluded that respondents had violated ORS 659A.409.

Finally, BOLI concluded that respondents' Article I, section 8, defense was conditional—that is, respondents intended to assert that ORS 659A.403, ORS 659A.406, and ORS 659A.409 were unconstitutional only if the voicemails were merely requests and not a denial of service:

"In their post-hearing brief, Respondents make it clear that this defense is based on their contention that Respondents only made a 'request' that the T-Girls not return, that Respondents never refused to provide or denied service to the T-Girls, and that to punish Respondents for making a 'request' violates Respondents' constitutional free speech rights. In contrast, the forum has concluded that Respondents' 'request' was not just Penner freely speaking his mind, but an actual denial of service. Respondents do not contend that the constitution protects them from actually denying service. Under these circumstances, neither the state nor [f]ederal constitutions protect Respondents' actions that the forum has found to violate ORS 659A.403, ORS 659A.406, and ORS 659A.409."

BOLI ordered respondents to pay damages of $400,000 to the 11 aggrieved persons and imposed $3,000 in civil penalties on Blachana, LLC, and $2,000 in civil penalties on Penner.

Respondents seek judicial review, raising three assignments of error. We review for legal error. ORS 183.482(8)(a),

(b)(C) (setting out standards of review for a contested case proceeding for erroneous interpretation of a provision of law and for impermissible exercise of discretion in violation of constitution); *Meltebeke*, 322 Or at 138-39. Below, we discuss, and ultimately reject, their first and third assignments of error. We reject their second assignment of error without further discussion because it is insufficiently developed for our review.

In their first assignment of error, respondents assert that BOLI erred in "finding that Mr. Penner's request that the T-Girls not come to the Bar on Friday nights any longer was discrimination under ORS 659A.403, where there was no finding that Mr. Penner intended to exclude or refuse to serve any person or group on account of their sexual orientation." Respondents do not dispute that Penner's conduct was "on account of" the T-Girls' sexual orientation. Rather, they contend that BOLI failed to make an explicit finding that Penner "intended to exclude the T-Girls, or otherwise suggest that he would refuse them service" and that, in the absence of an intention to deny service, respondents did not violate ORS 659A.403.

We reject that argument because, as noted above, BOLI expressly interpreted "Penner's request for the T-Girls 'not to come back' on Friday nights as a statement that they were not welcome at the P Club on Friday nights." In other words, BOLI found that Penner communicated his intention to exclude the T-Girls on Friday nights by telling them that they were not welcome—that is, by telling them that they would not be allowed to meet at the P Club on Friday nights because of their sexual orientation.[8] BOLI's interpretation of Penner's statement necessarily includes a finding that Penner intended to exclude the T-Girls from the P Club on Friday nights. Given that factual finding, by which we are bound, ORS 183.482(7); *Meltebeke*, 322 Or at 134, respondents' argument is unavailing.

We turn to respondents' third assignment of error, in which they reiterate their contention that, under Article I,

---

[8] We note that, contrary to respondents' assertion in their reply brief, the ALJ interpreted the voicemails the same way—as a statement by Penner that the T-Girls were not welcome at the P Club on Friday nights.

section 8, they "had a right to express their desire to the Rose City T-Girls, that the association no longer use Respondents' place of business as their Friday night gathering place." Respondents first assert that ORS 659A.403 and ORS 659A.409 fall in the first *Robertson* category because they are "both directed at the substance of a defendant's communication." Second, they assert that those provisions are overbroad if they fall in the second *Robertson* category. Third, they argue that, in any event, under the third *Robertson* category, the provisions are unconstitutional as applied to respondents.

We reject respondents' facial challenge—their first and second assertions—without extended discussion. As explained above, before BOLI, respondents did not advance any argument under the *Robertson* framework. Moreover, on judicial review, in arguing that ORS 659A.403 and ORS 659A.409 fall in the first or second *Robertson* categories, respondents still do not cite or discuss the text of those provisions; instead, they contend that the purpose of this enforcement action was to punish respondents for Penner's use of the terms "tranny bar" and "gay bar" rather than for a denial of service. That contention does not address the questions that inform a determination of whether a statute falls within either of the two first *Robertson* categories: whether the "terms" of the provision are "directed at the substance" of a communication or whether the law proscribes "speech or writing." *Babson*, 355 Or at 391. Rather, respondents' argument, which focuses not on statutory text but on its application to a set of factual circumstances, informs the *Robertson* "category three" analysis.

We turn to that "category three" question, that is, respondents' as-applied challenge to BOLI's enforcement of the statutes against respondents in these circumstances. In that challenge, respondents argue that BOLI's application of ORS 659A.403 and ORS 659A.409 to Penner's conduct is unconstitutional here because the focus of the case was Penner's speech. They point out that "[t]he 'forbidden effects' would be whether [the T-Girls] were, in fact, denied service" and assert that "[t]he evidence on that subject was scant, at best," because, after hearing the voicemails, none of the T-Girls returned to the club.

That argument is unavailing given BOLI's factual findings and legal conclusion. As noted above, BOLI determined that "[r]espondents' 'request' was not just Penner freely speaking his mind, but an actual denial of service." As we understand it, that statement includes a finding that, through the voicemails, Penner was not just stating his opinion, but was actually informing the T-Girls that they would not be served if they came to the P Club on Friday nights. That finding is supported by substantial evidence. *See* ORS 183.482(8)(c) (appellate court shall set aside or remand an order that "is not supported by substantial evidence in the record"); ORS 183.482(7) ("[T]he court shall not substitute its judgment for that of the agency as to any issue of fact * * *."). BOLI was not required to believe Penner's testimony that the voicemails were not intended to, and therefore did not, communicate that the T-Girls would not be served if they came to the P Club on a Friday night. Rather, it could—and did—find that the voicemails expressed that the T-Girls would not be served if they came to the P Club on a Friday night.

We turn to BOLI's legal conclusion. We agree with respondents that the "forbidden effect" at issue here is a denial of full and equal accommodations—in this case, a denial of service. *See* ORS 659A.403. BOLI concluded that Penner's speech itself constituted that forbidden effect: When Penner left the voicemails for Lynn, he was verbally barring her and the T-Girls from the P Club on Friday nights.

As noted above, respondents assert that "the evidence [that the T-Girls were denied service] was scant, at best," and they place significance on the fact that the T-Girls did not return to the P Club after hearing the voicemails. But, as noted above, BOLI concluded that Penner's speech— the voicemails themselves—constituted the forbidden denial of service. That is, the denial of service was complete when Penner left the voicemails. In light of that legal conclusion, to which respondents raise no preserved challenge, the fact that none of the T-Girls returned to the club after hearing the messages—that is, after the denial of service took place—is immaterial.

We have considered the remaining arguments that respondents make in support of their third assignment of

error and reject them as unpreserved, not adequately developed for our consideration, or both.

Affirmed.