Argued and submitted September 11, 2012, affirmed June 19, 2013

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JEFFREY DEAN BEAGLEY,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR0801358; A145054 (Control)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARCI RAE BEAGLEY,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR0801359; A145194

305 P3d 147

Wayne Mackeson argued the cause for appellants. With him on the brief was Steve Lindsey.

Cecil A. Reniche-Smith, Assistant Attorney General, argued the cause for respondent. With her on the brief was

John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Defendants were convicted of criminally negligent homicide, ORS 163.145, after their 16-year-old son died from an extended illness during which defendants, in accord with their religious beliefs, did not provide any conventional forms of medical care. The jury found that defendants failed to be aware of a substantial and unjustifiable risk that the child would die and that the failure was "a gross deviation from the standard of care that a reasonable person would observe in the situation." ORS 161.085(10) (defining criminal negligence). On appeal, defendants argue that, for several reasons, the indictment did not state a crime; that the court's jury instructions were prejudicially erroneous in several respects; and that the court erroneously denied their motion to exclude evidence regarding the death of defendants' granddaughter, who also died after not receiving needed medical treatment. We affirm.

Although the record in this case is lengthy, the relevant facts on appeal are few. Defendants' son, Neil, had a rare congenital abnormality that caused the progressive loss of kidney function. The abnormality began to manifest, at the latest, in March 2008. Thereafter, Neil became increasingly weak, unable to hold down food, and unable to breathe freely. Because of their religious beliefs, and because Neil (who shared those beliefs) did not want to be medically treated, the family relied on what is commonly called "faith healing"— prayer, the laying on of hands, and anointment with oil. Neil rallied on one or two occasions but, on June 17, 2008, he died from complications of kidney failure. Medical intervention in the week before Neil died would have saved his life.

Defendants were each tried for criminally negligent homicide.[1] ORS 163.145. The indictments charged each with causing the death of Neil "by failing to provide adequate medical care to [him], in violation of the duty of a parent." Defendants unsuccessfully demurred to the indictment, and a nine-day trial ensued. The jury returned guilty verdicts. Defendants now appeal.

---

[1] At trial, defendants joined in each other's motions and arguments and received identical judgments and sentences. Their cases are consolidated on appeal.

A precise and complete definition of "criminal negligence" as it applies to this case will clarify several of the issues on appeal. A person commits criminally negligent homicide "when, with criminal negligence, the person causes the death of another person." ORS 163.145. "Criminal negligence," in turn, is defined in ORS 161.085(10):

> "'Criminal negligence' or 'criminally negligent,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

Further, like all criminal offenses, criminally negligent homicide may be based on a person's "omission to perform an act which the person is capable of performing," ORS 161.095(1), if the act is one "the performance of which is required by law," ORS 161.085(3).

Thus, to be guilty of criminally negligent homicide in a case like this, a person must (1) have a legal obligation to provide life-sustaining medical care to the person's child, (2) have the capability to perform that act, (3) fail to be aware that not performing the act creates a substantial and unjustifiable risk that the child will die, such failure of awareness being a gross deviation from the standard of care that a reasonable person would observe in the situation, and (4) not act, resulting in (5) the child's death. The first element—the existence of a parent's legal obligation to provide life-sustaining medical care to his or her child—is a question of law. The second, fourth, and fifth elements are undisputed: Defendants were capable of providing medical care, did not do so, and that failure caused Neil's death. The questions presented on appeal, then, cluster around three issues: first, whether the criminal negligence statute as charged in this case imposed, or constitutionally *could* impose, an obligation on defendants to provide life-sustaining medical care for Neil; second, whether the jury was properly instructed as to what facts it needed to find in order to return a guilty verdict; and third, whether the jury might have been prejudiced by hearing inadmissible evidence.

Defendants raised the first cluster of arguments by demurrer, which the court denied. Those arguments, in essence, reduce to two propositions: First, ORS 163.145 as applied in this case does not state a crime because the gravamen of the offense as charged in the indictment is an unjustifiable failure to perform a duty "required by law," and the duty to provide needed medical care to one's child is not "required by law"; and second, if the indictment does state a crime, it violates constitutional guarantees of religious freedom.

The issues raised by these arguments do not come to us on a blank slate. In *State v. Hays*, 155 Or App 41, 964 P2d 1042, *rev den*, 328 Or 40 (1998), the defendant, following the teachings of his religion, relied on faith healing instead of medical care to treat his son's leukemia. When the son consequently died, the defendant was convicted of criminally negligent homicide. *Id.* at 43. On appeal, he raised statutory and constitutional challenges to the prosecution. We affirmed the conviction, and in the process reached several conclusions that bear on the disposition of this case. We held that a parent has an "absolute" duty to "provide needed medical care to a child," subject only to legislatively established exceptions to accommodate the parent's belief in "treatment by spiritual means." *Id.* at 47 n 3. The legislature, we observed, had enacted a statute, ORS 163.206(4), relieving a parent of his or her duty to provide needed medical care for purposes of prosecution for criminal mistreatment, but not with respect to prosecutions for criminal negligence. *Id.* at 47. Read together, we reasoned, the criminal negligence and criminal mistreatment statutes produce the following rule:

> "[T]he statutes permit a parent to treat a child by prayer or other spiritual means so long as the illness is not life threatening. However, once a reasonable person should know that there is a substantial risk that the child will die without medical care, the parent must provide that care, or allow it to be provided, at the risk of criminal sanctions if the child does die."

*Id.* That rule, we held, was not unconstitutionally vague, nor did it offend constitutional guarantees of due process or religious freedom. *Id.* at 47-49.

Defendants acknowledge *Hays* and appear to recognize that a strict application of *stare decisis* would defeat their assignments of error challenging the denial of their demurrers. However, they have presented us with no compelling reason now to conclude that parents do *not* have a legal obligation to provide needed life-sustaining medical care for their children, nor that parents' constitutional right freely to exercise their religion encompasses a right unreasonably to fail to meet that obligation.

Defendants do present one argument that we did not address in *Hays*. They point out that, in *Meltebeke v. Bureau of Labor and Industries*, 322 Or 132, 151, 903 P2d 351 (1995), the Oregon Supreme Court held that, under the free exercise guarantee of the Oregon Constitution, "[a] person against whom a sanction is to be imposed for conduct that constitutes a religious practice must *know* that the conduct causes an effect forbidden by law." (Emphasis in original.) That rule, defendants argue, renders the application of the criminal negligence statute unconstitutional in this case, because it imposes a sanction based on negligent omission, while the constitution requires a knowing omission.

*Meltebeke* involved a civil sanction imposed by the Bureau of Labor and Industries (BOLI) on an employer who was accused of religious discrimination by "creating an intimidating and offensive working environment" after insistently proselytizing an employee. *Id.* at 136. The employer appealed, arguing that proselytizing was an exercise of his religion and, for that reason, protected under Article I, sections 2 and 3, of the Oregon Constitution, as well as the First Amendment to the United States Constitution. After concluding that the BOLI rule was not facially unconstitutional, the court held that BOLI could not enforce the rule unless it could prove that the employer knew that his conduct would result in forbidden discrimination. *Id.* at 151-52. The court carefully noted, however, that "[c]onduct that may be motivated by one's religious beliefs is not the same as conduct that constitutes a religious practice. The knowledge standard is considered here only in relation to the latter category." *Id.* at 153 n 19. We find it difficult to understand this distinction between religious conduct and religious practice. Perhaps it draws a line between conduct that is directly

mandated by a religion and would not be performed except for that mandate—for example, praying, making the sign of the cross, wearing prescribed clothing (a yarmulke)—and ordinary conduct that a person might engage in for reasons unrelated to religion, but, in some circumstances, might engage in as the result of religious teaching—for example, abstaining from alcohol, "turning the other cheek," giving to charity, slaughtering chickens. Perhaps, under *Meltebeke*, the former are religious practices to which the "knowledge standard" applies, and the latter are conduct that "may be motivated by one's religious beliefs," to which that standard does not apply. *Id*. That formulation, however, is not completely satisfactory. The practice of abstaining from alcohol, for example, is *both* directly mandated by some religions, and it is also frequently observed by nonadherents for nonreligious reasons.

We need not resolve this conundrum here, however, for two reasons. First, we conclude that, regardless of where the line between religious practice and religiously motivated conduct is drawn, there are some behaviors that fall clearly to one side or the other. A Catholic taking communion at mass is clearly and unambiguously engaging in a religious practice; on the other side of the line, allowing a child to die for lack of life-saving medical care is clearly and unambiguously—and, as a matter of law—conduct "that may be motivated by one's religious beliefs." Second, *Meltebeke* involves civil sanctions; nothing in that opinion leads us to believe that the holding would apply to criminal law. Imposing a sanction for negligently withholding life-sustaining medical care does not interfere with protected religious expression.

We turn to defendants' arguments regarding jury instructions. In seven assignments of error, they contend that the court erroneously refused to give proffered instructions and erroneously gave objectionable instructions. Regarding the former, a party is not entitled to an instruction that incorrectly states the law. Further, so long as the instructions that are given are correct and complete, a party is not entitled to the clearest statement of the law. *State v. Barnes*, 329 Or 327, 334, 986 P2d 1160 (1999). Regarding erroneous instructions, "a jury instruction does not constitute reversible error unless it prejudiced the defendant when

the instructions are considered as a whole." *State v. Bowen*, 340 Or 487, 516, 135 P3d 272 (2006). Prejudice occurs if "the jury's guilty verdict on one or more of the charges could have been based on the theory of criminal responsibility contained in the erroneous instruction." *State v. Lopez-Minjarez*, 350 Or 576, 585, 260 P3d 439 (2011).

After lengthy discussion with counsel, the court gave the following relevant jury instructions:

"A person acts with criminal negligence if that person fails to be aware of a substantial and unjustifiable risk that a particular result will occur and circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

"When used in the phrase 'did unlawfully and with criminal negligence cause the death of another human being, Neil Jeffrey Beagley, by failing to provide adequate medical care to a child, in violation of the duty of a parent,' criminal negligence or criminally negligent means that the person fails to be aware of a substantial and unjustifiable risk that the child will die without medical care. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

"Now, criminal negligence is also established if the State proves that the person acts recklessly. A person acts recklessly if the person is aware of and consciously disregards a substantial and unjustifiable risk either that a particular result will occur or that a particular circumstance exists.

"The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

"Now, in connection with the phrase with regard to this case, that would mean that the particular result—in terms of measuring the definition of reckless conduct, that particular result would be the substantial and unjustifiable risk that the child would die without medical care.

"* * * * *

"Now, though it is true that our constitution generally protects free expression or religious practices and beliefs, these constitutional protections are limited when the safety and welfare of children are involved. It is not a defense to the charges of criminally negligent homicide that the defendants' care or treatment of their child was based solely upon spiritual means pursuant to the religious beliefs or practices of the defendants.

"Oregon law requires that a parent provide necessary and adequate medical care to a child. A child is defined as an unmarried person under 18 years of age. A person under the age of 18 years does not have a legal right to refuse medical care."

Defendants raise seven assignments of instructional error. We first address the instructions individually, and then we address whether, taken together, they prejudicially misinformed the jury.

First, defendants argue that the court erred in instructing the jury that "Oregon law requires that a parent provide necessary and adequate medical care to a child." As noted above, however, under *Hays*, 155 Or App at 47 n 3, that instruction correctly states the law. There is such a duty, subject to legislatively created exceptions. Defendants maintain that the jury should have been informed of those exceptions, but we disagree; the exceptions are not relevant to criminally negligent homicide, the crime with which defendants were charged.

Second, they challenge the court's instruction that defendants' religious beliefs and practices do not provide them with a defense to the charges of criminally negligent homicide. That instruction, too, correctly states the law under *Hays. Id.* at 45 ("A person who treats a dependent child through prayer, thus, has a defense to a charge of criminal mistreatment, a defense that does not apply to a charge of criminally negligent homicide.").

Third, they challenge the court's instruction that "[a] person under the age of 18 does not have a legal right to

refuse medical care." According to defendants, that instruction was error because a minor who is 15 or older—as Neil was at the relevant times—*does* have the legal right to refuse medical care. They ground this assertion in ORS 109.640 (2005), which provides that a minor aged 15 or older may give consent to "hospital care, medical or surgical diagnosis or treatment by a physician licensed by the Oregon Medical Board, and dental or surgical diagnosis *** without the consent of a parent or guardian."[2] From this statute, defendants draw the inference that, because a child aged 15 or older has the right to consent to medical care, he or she must also have the corollary right to refuse consent. That inference does not logically follow from the language of the statute. Indeed, when seen in context, the statute supports the instruction given by the court. ORS 109.510 establishes the age of majority as 18, and provides that, "thereafter," a person shall "[h]ave control of the person's own actions and business" and "[h]ave all the rights and be subject to all the liabilities of a citizen of full age." That statute implies (although it does not prove) that a person under the age of 18 does *not* have the rights of an adult citizen. That implication is strengthened by the statutes following ORS 109.640, in which the legislature expressly lists the rights of minors. That list does not include the right to refuse medical care. ORS 109.610 - 109.697. We conclude that, if the legislature had intended to confer on minors aged 15 and older the right to refuse medical care, it would have expressly said so. Further, defendants provide no support for the proposition that the common law or constitution endows minors with that right. Although we can imagine situations in which a mature minor might have the right to reject, for example, a parent's wish to have the child undergo an abortion, or plastic surgery, or circumcision, *Boldt and Boldt*, 344 Or 1, 176 P3d 388 (2008), those situations do not bear on whether the instruction was correct in the context of a criminal homicide case where the supposed right of refusal involves necessary life-preserving care.[3] The court's instruction was not error.

---

[2] ORS 109.640 was amended in 2010, but the quoted language is unchanged.

[3] We emphasize that a mature minor *might* have such a right. We need not and do not decide that issue in this case.

In addition to asserting that the court gave affirmatively erroneous instructions, defendants also argue that the court refused to give correct instructions. Defendants proposed, and the court rejected, the following instructions:

### "SPECIAL INSTRUCTION NO. 2

"Oregon law permits a parent to treat a child by prayer or other spiritual means so long as the illness is not life threatening. However, if a reasonable person in the situation should know that there is a substantial and unjustifiable risk that the child will die without adequate medical care, then the parent must provide that care, or allow it to be provided."

### "SECOND ALTERNATIVE SPECIAL INSTRUCTION NO. 2

"A parent has a right to direct the religious upbringing of his or her child.

"Oregon law permits a parent to treat a child by prayer or other spiritual means so long as there is not an immediate threat to life. However, if a reasonable person in the situation should know that there is an immediate threat to life without adequate medical care, then the parent must provide that care, or allow it to be provided."

### "SPECIAL INSTRUCTION NO. 9

"Under Oregon law, a minor 15 years of age or older may give consent to hospital care, medical or surgical diagnosis or treatment by a physician licensed by the Oregon Medical Board, and dental or surgical diagnosis and treatment by a dentist license[d] by the Oregon Board of Dentistry, without the consent of a parent or guardian.

"The right to consent to hospital care, medical or surgical diagnosis or treatment by a physician and the right to consent to dental or surgical diagnosis and treatment by a dentist includes the right not to consent, that is, the right to refuse such care, diagnosis and treatment."

### "SPECIAL INSTRUCTION NO. 10

"Under Oregon law, a minor 15 years of age or older may give consent to hospital care, medical or surgical diagnosis

or treatment by a physician licensed by the Oregon Medical Board, and dental or surgical diagnosis and treatment by a dentist license[d] by the Oregon Board of Dentistry, without the consent of a parent or guardian."

The court properly rejected special instructions 9 and 10 for the same reason that it properly gave the state's instruction that a person under the age of 18 does not have the right to refuse medical care: Special instruction 9 is not a correct statement of the law, and special instruction 10, although accurate, is irrelevant, because this case does not involve consent.

Likewise, the court did not err in rejecting second alternative special instruction No. 2; it, too, does not correctly state the law. Nothing in *Hays* or any other source of law permits a parent to withhold medical care until the threat to life becomes *immediate*. Rather, under *Hays*, the obligation to provide life-saving medical care accrues when a reasonable person unreasonably and unjustifiably fails to recognize that failure to provide medical care creates a risk to life—regardless of the risk's immediacy. Thus, for example, the obligation to treat childhood leukemia would accrue when a parent learns that the child has the disease and that it is fatal without treatment—and not at the time when the disease has progressed to the point that death is imminent.

Defendants' special instruction No. 2, however, is an accurate and concise restatement of the holding in *Hays*. Thus, whether the court erred in rejecting the instruction depends on whether the instructions, taken as a whole, could have led the jury to return a guilty verdict under an erroneous impression of the law. For the reasons that follow, we conclude that the court did not err.

The thrust of defendants' challenges to the jury instructions is that, "[i]n sum, the trial court directed a verdict in favor of the state." By that, defendants mean that their theory of the case was that, because of the gradual onset of Neil's symptoms, the undramatic nature of those symptoms, and his periodic partial remissions, defendants' failure to recognize that his condition was life-threatening was not unreasonable—or, at least, not a gross deviation

from the standard of care that a reasonable person would observe in the situation. To properly address that question, defendants argue, the jury had to know that defendants' obligation did not arise—that is, that their actions were not unlawful—until Neil's condition became obviously life-threatening. In order to make that determination, according to defendants, the jury had to know where the line was drawn between *permissible* treatment by spiritual means alone and *criminal* treatment by spiritual means alone. Defendants argue that the court's refusal to tell the jury where that line was, combined with the instructions that (1) Oregon law requires parents to provide necessary and adequate medical care to a child and (2) religious belief or practice is not a defense against criminally negligent homicide—this combination of instructions given and instructions refused misled the jury into believing that defendants could be convicted even if a reasonable person in their position would *not* have known that the omission created an unjustifiable risk of his death.

Defendants' argument is ultimately unpersuasive. Jurors must be correctly informed of what facts they need to find in order to return a guilty verdict. They do not need to know what facts, if found, will *not* suffice. The latter is implicit in the former. Thus, if a conviction for first-degree burglary requires the jury to find that a defendant entered a dwelling with the intent to commit a crime therein, ORS 164.225, the court does not need to instruct that a defendant is *not* guilty of first-degree burglary if she enters a dwelling without the requisite intent, or if the building she enters is not a dwelling. The instructions in this case correctly informed the jurors as to what 10 of them had to find in order to convict defendants of criminally negligent homicide: that defendants failed to be aware of a substantial and unjustifiable risk that Neil would die without medical care and that defendants' failure to be aware of that risk constituted a gross deviation from the standard of care that a reasonable person would observe in the situation. The jury was also correctly informed that defendants' religious beliefs were not a defense. Viewed as a whole, the instructions were free from error.

In a final assignment of error, defendants challenge the court's decision to allow testimony from a police officer that defendants were present when, three months before Neil's death, defendants' granddaughter also died from lack of medical care. Defendants argue that the testimony was not relevant to any contested issue. They concede that the testimony would have been relevant to prove that defendants were aware of, but consciously disregarded, the risk of Neil's death. That fact, they assert, was not in play in this case; it would have been in play had the state charged defendants with reckless homicide, but the indictment charged only negligent homicide.

We agree with the state that defendants' arguments are unconvincing for two reasons. First, one way to prove negligence is to prove recklessness: "If the definition of an offense prescribes criminal negligence as the culpable mental state, it is also established if a person acts intentionally, knowingly or recklessly." ORS 161.115(3). Second, the fact that defendants had witnessed the death of another child due to lack of medical care makes it more probable, not only that they *did* know that Neil was at risk, but that they *should have known* that Neil was at risk. In other words, the testimony was not relevant only to a charge of recklessness, and thereby relevant to a charge of negligence; it was directly relevant to the charge of negligence.

In sum, the trial court properly denied defendants' demurrers to the indictment, did not misinstruct the jury, and correctly allowed testimony regarding the death of defendants' granddaughter. We therefore affirm.

Affirmed.