No. 37          October 8, 2015          1

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

SHANNON MAE HICKMAN,
*Petitioner on Review.*

(CC CR1001094; CA A150127; SC S061896 (Control))

STATE OF OREGON,
*Respondent on Review,*

*v.*

DALE RYAN HICKMAN,
*Petitioner on Review.*

(CC CR1001093; CA A150126; SC S061902)

En Banc

On review of an order of the Court of Appeals.*

Argued and submitted October 8, 2014.

Bronson D. James, Portland, argued the cause for petitioners on review and filed the briefs for petitioner on review Shannon Mae Hickman.

Ryan E. Scott, Scott & Huggins Law Offices, Portland, filed the brief on behalf of the petitioner on review Dale Ryan Hickman.

Cecil Reniche-Smith, Senior Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Anna M. Joyce, Solicitor General, and Ellen F. Rosenblum, Attorney General.

Timothy R. Volpert, Davis Wright Tremaine LLP, Portland, filed a brief on behalf of *amicus curiae* The American Civil Liberties Union of Oregon. With him on the brief were Kimberly L. McCullough and Kevin Diaz.

_____
    * Appeal from Court of Appeals Order of Summary Affirmance dated August 20, 2013. Appeal from Clackamas County Circuit Court, Robert D. Herndon, Judge.

LINDER, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

**LINDER, J.**

Defendants Dale and Shannon Hickman were convicted of second-degree manslaughter (ORS 163.125) after they declined to seek medical treatment for their son David, who died about nine hours after he was born prematurely. Defendants are members of the Followers of Christ Church. That church encourages its members to rely on God to heal sickness and injury, and considers resorting to conventional medicine as a failure in faith. At trial, defendants argued that, because they withheld medical treatment from David based on their religious beliefs, the Oregon Constitution requires the state to prove that they acted "knowingly"—that is, they knew that David would die if they relied on prayer alone and, despite that knowledge, failed to seek medical treatment for him. The trial court disagreed and allowed the state to proceed on a theory of "criminal negligence," consistently with the statute defining second-degree manslaughter by neglect or maltreatment. The Court of Appeals summarily affirmed. We granted review to consider whether the state must prove that a criminal defendant acted with "knowledge" that an unlawful result would follow when that defendant's conduct was motivated by a sincerely held religious belief. For the reasons explained below, we conclude that it does not.

I

Defendants Dale and Shannon Hickman have been lifelong members of the Followers of Christ Church. That church—drawing from the Christian Bible's descriptions that Jesus and his disciples, rather than doctors, healed the sick and disabled—instructs its members to rely on "faith healing" and to eschew conventional medicine. For the Followers of Christ, faith healing entails prayer, anointing the sick with olive oil, or the laying on of hands. Those practices derive most directly from a passage in the New Testament, which provides:

> "Is anyone among you in trouble? He should turn to prayer. Is anyone in good heart? He should sing praises. Is one of you ill? He should send for the elders of the congregation to pray over him and anoint him with oil in the name of the Lord. The prayer offered in faith will save the sick

man, the Lord will raise him from his bed, and any sins he may have committed will be forgiven. Therefore confess your sins to one another, and pray for one another, and then you will be healed."

*James* 5: 13-16 (The New English Bible (1970 ed)). Accordingly, other than visiting a dentist and an optometrist, at the time of trial defendants had never seen a doctor for the purpose of receiving medical treatment or advice.[1] But defendants did not reserve the faith healing practice for themselves—they also used it to address their children's medical ailments. That decision—to pray for their children's health and well-being instead of taking them to the doctor—is what gave rise to the circumstances that led to this case.

Shannon was between 30 and 32 weeks pregnant when she began experiencing labor pains.[2] As was custom in the Followers of Christ community, Shannon went to her parents' home to deliver the child. Three women in the Followers of Christ community attended to the birth. Dale, along with several other family members, was also present in the birthing room. According to Shannon, the delivery was quick but was similar to that of her daughter, who had been born at full-term and without complication. After David was born, several women from the church—including David's grandmothers and great-aunts—cared for him. To keep David warm, they took him into the bathroom, where they had the heater turned on high, and wrapped him in towels and blankets that they had warmed in the dryer. They "downsized" diapers and a beanie hat to fit him and fed him using an infant spoon to pour breast milk into his mouth.

---

[1] Dale had, however, been physically examined by a doctor so that, in accordance with federal law, he could qualify to receive a Commercial Driver License. *See* 49 CFR §§ 391.41 and 391.43 (describing medical requirements to qualify for Commercial Driver License).

[2] According to doctors who testified at trial, a term pregnancy is between 37 and 42 weeks, with the average at 40 weeks. Shannon did not know her exact due date because she had not been to a doctor to determine when David had been conceived. She testified that, based on her menstrual cycle, which had been irregular, she believed that her due date was anywhere between October 31, 2009 and December 25, 2009. She chose November 20, 2009, the midpoint between those two dates, as the due date to announce to others.

Despite knowing that David was around two months premature, neither defendant—according to their testimony—thought that David was or would soon be in physical distress. Aside from David's tiny size—he weighed three pounds and seven ounces—defendants believed that he was healthy: They testified that he had a strong cry, his whole body was pink, and he was able to pump his arms vigorously. But David was not healthy and was not thriving. He died a mere nine hours after he was born.

Although the medical examiner initially suspected that David had died from sepsis caused by Group B streptococcus, the laboratory results did not support that conclusion. Instead, the Oregon State Medical Examiner's office determined that the cause of David's death was staphylococcus pneumonia, with other significant conditions being pulmonary immaturity and chorioamnionitis. The medical examiner found no evidence of sepsis, congenital anomalies, or asphyxiation. Drawing from different aspects of the medical examiner's report, the parties presented two different theories for the cause of David's death.

According to defendants, David was lively, pink, and vigorous until moments before he died. In those final moments, David's great-aunts were caring for him while defendants were asleep. One of the aunts awoke Dale after they noticed that David was "fading," both in color and in the muscle tone of his face. As one of them described it, David had "[j]ust a different look in his face," which led them to believe that he was "going very quickly." Dale ran into the room where one of his aunts was holding David and anointed David's head with olive oil and began to pray. He noticed that David was taking short breaths, was minimally responsive, and was lighter in color, so he took David into the bedroom where Shannon still lay. At that point, it was "in the back of [Dale's] mind" that David would not survive. He sat in a chair by the bed, held David in his arms, and prayed. According to Shannon, when she sat up and looked at David, he "didn't look like the baby [she] had seen a couple of hours before." He was pale and, from the time he entered the room until he died, she believed she heard him breathe only once or twice. Over the next few minutes, David turned blue, then gray. Dale believed that it was about five to 10

minutes from the time his aunts woke him until David died; Shannon believed it was about five minutes.

In defendants' view, David's symptoms were consistent with early-onset sepsis, an infection in the bloodstream that is often fatal. Although defendants recognized that the medical examiner's laboratory results did not support that conclusion, they argued that both Shannon and David had physical symptoms that supported a finding of early-onset sepsis. First, they pointed to the medical examiner's conclusion that chorioamnionitis was an "other significant condition" contributing to David's death. Chorioamnionitis is a condition that affects the mother and can cause preterm labor. Specifically, it is an infection of the two layers of the amniotic sac—the chorion and the amnion—that can spread and infect the unborn child. If the infection spreads to the child, it can lead to early-onset sepsis. Second, defendants relied on another doctor's testimony that infants who have early-onset sepsis can appear to a lay person to be in perfect health, but then suddenly "drop off the cliff" and die shortly thereafter, as defendants contend happened with David.

According to the state, defendants' theory that David was perfectly healthy and then suddenly developed symptoms within 15 minutes of his death made "no biological sense." Instead, the state urged that David struggled to stay alive from the moment he was born, due to complications that resulted from his prematurity. The state's expert witnesses testified that an infant born at 30- to 32-weeks gestational age has a greater than 90 percent chance of survival if he receives medical treatment; however, without medical treatment, he has "zero" chance of surviving. That is so because preterm infants have underdeveloped organs. Specifically, an infant born at 30- to 32-weeks gestational age, like David, is likely to have pulmonary immaturity, *i.e.*, underdeveloped lungs, compounded by a lack of body fat to regulate the infant's temperature. Infants born at that gestational age also might not have developed the ability to suck and swallow, causing them to have trouble eating on their own.

Doctors who testified for the state were able to watch a video of David that family members recorded about

one hour after he was born. The doctors noticed that, in that video, David's chest was retracting, a sign that he was having to rely heavily on his chest muscles to breathe; they also noticed that he was grunting, indicating that he was continually trying to open his airways. Both retractions and grunting are classic signs of respiratory distress. The doctors observed that David had a strong cry, but that did not alter their assessment that he was in obvious distress, because a strong cry does not necessarily indicate strong lungs. The doctors conjectured that, as the night progressed, David would have shown more signs of respiratory distress: tachypnea, *i.e.*, fast breathing, as well as more retracting and grunting. Then, at some point, he would have grown too tired, and his fast breathing would have turned into slow breathing, and eventually apnea, or periods without breathing at all. As long as David continued breathing, he would have been receiving enough oxygen to remain pink; but as soon as his breathing slowed down, he would have lost color. The state's doctors believed that, for an infant at David's gestational age, that process would not have taken just 15 minutes, as defendants contended; rather, it would have taken hours.

In the state's doctors' view, defendants failed to heed obvious signs of David's distress. In particular, defendants did not properly respond to the facts that David was born two months prematurely; that he was not able to adequately feed; and that, at the very least, he eventually turned blue and gray, had labored breathing, and was minimally responsive. Although defendants contended that they did not have time to dial 9-1-1 once David started to "fade," the state's doctors disagreed, stating that, at that point, defendants could not have known how long David was going to be able to survive. If defendants had called 9-1-1 at the moment that David was born, when they noticed that he was born prematurely, medical professionals immediately would have been able to give David antibiotics to ward off any infection resulting from Shannon's chorioamnionitis; to monitor and regulate David's temperature and breathing; and to feed David intravenously. If David had received that treatment, one doctor estimated that David would have had a 99 percent chance of survival.

At the least, the state's doctors testified, defendants should have called an ambulance later in the night, once David started "fading." Defendants themselves acknowledged that the nearest fire station was less than a five-minute drive from Shannon's parents' home in a non-emergency vehicle. And doctors for the state explained that several Oregon hospitals have newborn transport teams that respond within mere minutes when they receive a 9-1-1 call regarding a newborn. Those teams travel in an ambulance that is essentially a mobile neonatal intensive care unit, and they are capable of doing almost everything in the field that doctors can do in a hospital. The state's doctors believed that, if defendants had called 9-1-1 immediately after defendants noticed a change in David's health, the fire station's paramedics could have kept David alive until the more specialized ambulance arrived, at which point David would have been able to receive the same kind of medical treatment that he would have received in a neonatal intensive care unit.

Finally, according to the state's doctors, the treatment that defendants provided to David was simply not adequate to address his medical needs as a premature infant. One doctor opined that wrapping David in towels warmed in the dryer was "primitive" and a bad idea in place of what could have been done. Further, it was obvious to the doctors that David had feeding problems. The fact that the church women had to pour milk into David's mouth using a baby spoon—instead of feeding him through a bottle—suggested that he had not yet developed the suck and swallow reflex. Doctors testified that a full term baby initially will drink four ounces of milk. During the autopsy, the medical examiner found one milliliter (less than one ounce) of milk in David's stomach.

At trial, defendants testified that they had been members of the Followers of Christ church for their entire lives. Regarding medical concerns, both place their faith in God and refuse to resort to conventional medicine. In Shannon's words, "We do what the Bible tells us, and we put God first and ask for faith. If we don't have the faith, then we seek medical treatment because it is not there, you know." And according to Dale, their faith is "everything" to

them. Both of them testified that, looking back on David's death, they would not have done anything differently. They maintained that they did not believe that anything was medically wrong with David after he was born, despite his prematurity. And by the time they realized that David was having medical complications, they believed that it was too late—that he would have died before an ambulance could have responded.

## II

## A

With that factual backdrop, we turn to the procedural posture of the issue before us. Because that procedural posture—specifically, the way in which defendants have framed their arguments from the trial court and since—bears significantly on our ultimate disposition, it is helpful to discuss it in some detail.

The state charged defendants with second-degree manslaughter under ORS 163.125, alleging that each was criminally negligent in causing David's death through neglect or maltreatment. In essence, the state alleged that defendants failed to be aware of the substantial and unjustifiable risk that David, without medical treatment, would die and, further, that their failure to recognize that risk was a gross deviation from the standard of conduct that a reasonable person in their position would have observed.[3] To prove that defendants were criminally negligent, the state presented testimony from medical experts who all agreed that David's distress was obvious from the moment he was born prematurely and that medical care to address his distress was not only readily available, but also would almost surely have been successful in saving him.

Defendants themselves did not raise or inject their religious beliefs into their defense theory. Instead, defendants relied on their testimony that, by all appearances,

_____

[3] Under ORS 161.085, which we later quote, criminal negligence "means that a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstance exists." The standard is an objective one: "The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." *Id.*

David was a healthy, thriving baby for nearly nine hours, and that he declined precipitously only minutes before he died. Their essential theory was that no reasonable person in their position would have understood David to be at risk of dying, and that by the time it became apparent that he was in critical distress, too little time remained to take any steps that could reasonably have saved him. Under their *factual* theory, then, defendants' religious beliefs were beside the point; a reasonable person—regardless of his or her religious beliefs—would not have recognized that David was in danger of dying and, as a result, would not have done anything differently.

Defendants' religious beliefs were relevant given the state's theory of the case, however. Even with the state's medical experts' testimony, a looming question remained: Why? Why would any parent, seeing his or her three-and-a-half pound newborn child in the obvious distress that the experts described, not call for medical help? One answer could have been to believe defendants' explanation—things did not happen the way the experts claimed they did. Another answer could have been the one that the state's evidence provided—defendants, due to their religious beliefs, were unwilling to heed or were otherwise blind to the risk that David would die and were unwilling to seek medical care to prevent his death.

Although defendants did not raise or assert their religious beliefs in their *factual* defense to the charges, they did rely on those beliefs to *legally* defend against the charges by attempting to hold the state to a heightened burden of proof on mental state. In particular, before trial, defendants demurred to the indictment and, later, moved to dismiss it, arguing that the indictment failed to state a crime because it alleged that defendants acted with "criminal negligence," rather than with "knowledge" that David would die as a result of their failure to provide medical care for him. Relying on this court's decision in *Meltebeke v. Bureau of Labor and Industries*, 322 Or 132, 903 P2d 351 (1995), defendants argued that Article I, sections 2 and 3, of the Oregon Constitution require the state to prove that defendants "knew" that their religiously motivated conduct would produce an unlawful result. The trial court, however,

disagreed. It therefore declined to dismiss the indictment or to require the state to allege that defendants acted "knowingly," and the case proceeded to trial.

After the state presented its case-in-chief, defendants moved for judgment of acquittal, again arguing that, according to *Meltebeke*, the state should have been held to the additional burden of proving that defendants "knew" that David would die if they failed to seek medical treatment for him. Because the state had not proven beyond a reasonable doubt that defendants acted with that "knowledge," defendants argued, they should be acquitted of second-degree manslaughter. The trial court denied defendants' motion.

At the close of trial, the state argued that the jury should find defendants guilty of second-degree manslaughter. Consistently with the statute defining that crime,[4] the state contended that defendants acted with criminal negligence by failing to immediately call 9-1-1 when David was born two months prematurely, and also by failing to call 9-1-1 once they noticed that his health was rapidly declining, which the state maintained happened in time for medical assistance to have come to David's aid. The trial court instructed the jury that, in the context of this case, to act with criminal negligence meant to

> "fail[] to be aware of a substantial and unjustifiable risk that the death of David Hickman would occur. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in a situation."

Defendants objected to that instruction. Renewing their argument under *Meltebeke* and Article I, sections 2 and 3, of the Oregon Constitution, they contended that the jury should be instructed instead:

> "In order to find [defendants] guilty of Manslaughter in the Second Degree, the State must prove that [defendants] acted with knowledge that his or her act would bring

---

[4] We set out that statute in full later in our opinion.

about the death of David Hickman. Knowledge requires
an awareness on the part of the accused that the death of
David Hickman would occur as a result of [defendants'] act
or failure to act."

The trial court overruled defendants' objection and declined
to give their requested jury instruction. After delibera-
tion, the jury returned a unanimous guilty verdict for each
defendant.

Defendants appealed, raising *inter alia* the same
argument that they had raised before and during trial—*i.e.*,
that under *Meltebeke*, the trial court should have required
the state to prove that defendants "knew" that David would
die as the result of their failure to obtain medical treatment
for him. During the pendency of their appeal, the Court of
Appeals announced its decision in *State v. Beagley*, 257 Or
App 220, 305 P3d 147 (2013), another case involving a faith
healing prosecution. In that case, the parents had been
prosecuted for, and convicted of, criminally negligent homi-
cide, ORS 163.145, after they did not seek medical treat-
ment for their 16-year-old son, causing him to die of kid-
ney failure. *Id.* at 222-23. Similarly to defendants in this
case, the Beagleys argued that they had withheld medical
treatment from their son because their religious beliefs
instructed them to do so. *Id.* at 222, 225. As a result, the
Beagleys argued, under *Meltebeke* and Article I, sections 2
and 3, of the Oregon Constitution, the state was obligated
to prove that they "knew" their son would die if they did not
take him to the hospital. *Id.* at 225.

The Court of Appeals rejected the Beagleys' argu-
ments. It first described this court's decision in *Meltebeke*:

"*Meltebeke* involved a civil sanction imposed by the
Bureau of Labor and Industries (BOLI) on an employer
who was accused of religious discrimination by 'creat-
ing an intimidating and offensive working environment'
after insistently proselytizing an employee. The employer
appealed, arguing that proselytizing was an exercise of his
religion and, for that reason, protected under Article I, sec-
tions 2 and 3, of the Oregon Constitution, as well as the
First Amendment to the United States Constitution. After
concluding that the BOLI rule was not facially unconsti-
tutional, the court held that BOLI could not enforce the

rule unless it could prove that the employer knew that his conduct would result in forbidden discrimination. The court carefully noted, however, that '[c]onduct that may be motivated by one's religious beliefs is not the same as conduct that constitutes a religious practice. The knowledge standard is considered here only in relation to the latter category.'"

*Id.* (internal citations omitted). The court then stated that it did not understand *Meltebeke*'s distinction between religious conduct and religious practice, noting that "[t]he practice of abstaining from alcohol, for example, is *both* directly mandated by some religions, and it is also frequently observed by nonadherents for nonreligious reasons." *Id.* at 225-26 (emphasis in original). Nevertheless, the court reasoned, it did not have to resolve that conundrum in the case before it, because "allowing a child to die for lack of life-saving medical care is clearly and unambiguously—and, as a matter of law—conduct 'that may be motivated by one's religious beliefs.'" *Id.* at 226. The court further distinguished *Meltebeke* by noting that it involved civil sanctions, and that nothing in the opinion indicated that its holding would apply to a criminal prosecution. *Id.* After addressing and rejecting the Beagleys' other arguments, the court affirmed their convictions. *Id.* at 233.

After the court issued its decision in *Beagley*, defendants in this case narrowed the scope of their appeal and agreed that, as to this issue, *Beagley* was controlling at the Court of Appeals level. Accordingly, to expedite possible review by this court, defendants requested that their appeal be summarily affirmed. The Appellate Commissioner granted summary affirmance, and the Court of Appeals denied reconsideration. As already noted, on defendants' petition, we allowed review to determine whether, as defendants have framed the issue, "a religious practice, in this case faith healing, can be criminally sanctioned on less than a knowing mental state pursuant to this [c]ourt's holding in *Meltebeke v. BOLI*."

B

Before this court, the parties and the American Civil Liberties Union (ACLU), as *amicus curiae*, dispute whether

*Meltebeke* applies in the context of this case.[5] Defendants urge that, in keeping with *stare decisis* and to maintain stability in our free exercise jurisprudence, we should conclude that *Meltebeke*'s knowledge requirement applies in the context of this case. They further assert that we should reject the Court of Appeals' distinction, in *Beagley*, between civil sanctions and criminal prosecutions. If anything, defendants contend, the constitution should provide at least the same, if not greater, protection when a person faces criminal penalties for engaging in religiously motivated conduct that produces an unlawful result.

Both the state and *amicus* argue that *Meltebeke*'s holding rests on a faulty reading of *Smith v. Employment Division*, 301 Or 209, 721 P2d 445 (1986),[6] and accordingly, *Meltebeke*'s rule should be cast into doubt. But even if *Meltebeke* withstands close scrutiny, both the state and *amicus* agree that *Meltebeke* should be limited to its facts. They urge this court to decline to extend its holding to the context of this case.

After urging that *Meltebeke* should not control the outcome of this case, the state and *amicus* turn to the text, context, and history of Article I, sections 2 and 3, for guidance on how to approach the analysis in this context. Drawing from the dictate in Article I, section 2, that "[a]ll men shall be secure in the Natural right, to worship Almighty God according to the dictates of their *own* consciences," (emphasis added), both the state and *amicus* argue that the framers intended the free exercise clauses to protect the *individual* right to worship. However, when an individual's religiously motivated conduct interferes with another person's rights or

---

[5] The parties and *amicus* do, however, agree about one thing: This court should abandon *Meltebeke's* distinction between conduct that constitutes a religious practice and conduct that is merely religiously motivated. *See Meltebeke*, 322 Or at 153 n 19 ("Conduct that may be motivated by one's religious beliefs is not the same as conduct that constitutes a religious practice."). That distinction was *dictum* in *Meltebeke*, and this case does not require us to explore it any further. For purposes of this opinion, we use the terms "conduct" and "practice" synonymously, and no legal significance attends to our use of one term instead of the other.

[6] *Vacated by* 485 US 660, 100 S Ct 1444, 99 L Ed 2d 753 (1988); *federal grounds adhered to in* 307 Or 68, 763 P2d 146 (1988); *overruled on federal grounds by* 494 US 872, 110 S Ct 1595, 108 L Ed 2d 876 (1990).

interests (such as the health and well-being of a dependent child), the state and *amicus* urge that the individual's protected free exercise interests end.

Finally, the state argues that, even if this court were to conclude that Article I, sections 2 and 3, protect religious conduct that affects third parties, a law that is neutral toward religion and religious practices on its face and in its policies passes constitutional muster. That is so, according to the state, because the framers of the constitution, while concerned with protecting religious freedom, were also concerned with ensuring that the government remains neutral toward religion. To require the state—when a criminal defendant asserts that his or her acts were motivated by religion—to prove a higher mental state than that prescribed by the statute defining the crime would, in the state's view, amount to the state showing a preference for religion over nonreligion. That result would be antithetical to the framers' intent, according to the state. Thus, the state urges that this court should decline to apply a knowledge standard to the context of this case.

## III

Having set out the arguments presented to us for consideration, we turn to our analysis of the applicable law. As we most recently described in *State v. Brumwell*, 350 Or 93, 108, 249 P3d 965 (2011), when analyzing freedom of religion claims under Article I, sections 2 and 3,[7] this court has distinguished between applying rules that expressly target religion, on the one hand, and applying generally applicable and neutral rules to religiously motivated conduct, on the other hand. With regard to rules that specifically target religion, we apply "exacting" scrutiny to ensure that they comport with the commands of Article I, sections 2 and 3. *See Brumwell*, 350 Or at 108 (citing *Cooper v. Eugene Sch. Dist. No. 4J*, 301 Or 358, 369, 372, 723 P2d 298 (1986)). With regard to rules that are generally applicable and neutral

---

[7] Article I, section 2, of the Oregon Constitution provides: "All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences." Article I, section 3, provides: "No law shall in any case whatever control the free exercise, and enjoyment of religeious [*sic*] opinions, or interfere with the rights of conscience."

toward religion, however, the only issues for us to consider are whether there was "statutory authority to make such a regulation," or whether we should grant "an individual claim to exemption on religious grounds." *Cooper*, 301 Or at 368-69.

### A

The threshold question, then, is whether the laws at issue in this case specifically target religion, or are neutral and generally applicable. The law defining second-degree manslaughter—the crime with which defendants in this case were charged—provides:

"(1)   Criminal homicide constitutes manslaughter in the second degree when:

"* * * * *

"(c)   A person, with criminal negligence, causes the death of a child under 14 years of age or a dependent person, as defined in ORS 163.205, and:

"* * * * *

"(B)   The person causes the death by neglect or maltreatment, as defined in ORS 163.115."

ORS 163.125. "Criminal negligence," in turn,

"means that a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085. Finally, "neglect or maltreatment" means "a failure to provide adequate food, clothing, shelter or *medical care* that is likely to endanger the health or welfare of a child under 14 years of age or a dependent person." ORS 163.115(6)(b) (emphasis added).

On their face, those statutes neither discriminate against nor target religion or a particular religious sect. Rather, the crime of second-degree manslaughter by neglect or maltreatment applies on equal terms and with equal force to any parent or guardian who fails to be aware of a substantial and unjustifiable risk that withholding basic necessities

from a child will result in that child's death. Further, the statutes make no mention of religion or religious motivations. Accordingly, we readily conclude—and defendants do not argue otherwise—that the statutes at issue are generally applicable and neutral on their face.

Defendants have, however, shown that, even though the statutes are generally applicable and neutral, they do burden defendants' free exercise of religion. For defendants, to seek advice and treatment from a medical doctor means that they have failed to have faith. They take literally the Bible's prescription to "pray for one another, and then you will be healed." *James* 5: 16. However, "neglect or maltreatment," as used in the statute defining second-degree manslaughter, includes a "failure to provide adequate *** medical care." ORS 163.115. Defendants are thus faced with a profound dilemma: Rely on prayer to heal their seriously ill child, in keeping with the tenets of their faith, and potentially face criminal sanction; or take their sick child to the doctor in compliance with Oregon's criminal laws, and contravene their religious upbringing and faith.

Yet, defendants do not now argue—and as we discussed above, never have argued—that, because their conduct was religiously motivated, they are fully exempt from prosecution under the second-degree manslaughter statute. Instead, defendants have argued, from trial and consistently since, that the second-degree manslaughter statute should apply to them differently because their conduct was religiously motivated. That is, they have consistently maintained that, according to this court's decision in *Meltebeke*, the state should be held to the higher burden of proving that they "knew" that David would die if they relied on faith healing alone and failed to seek medical treatment for him.

B

The issue before us, then, is not whether and under what circumstances religiously motivated conduct is entitled to an exemption from a generally applicable and neutral law. Nor is the issue before us the more specific one of whether the defendants in this case are entitled to an exemption from prosecution for second-degree manslaughter. The issue

instead is more narrow: Did the state have to prove—and the jury have to find—that defendants acted with knowledge of the result of their conduct? We turn, then, to *Meltebeke* to consider whether that case stands for the proposition that defendants would have it stand for—*viz.*, to impose sanctions on religiously motivated conduct, the state must prove the culpable mental state of "knowledge," even if a lesser culpable mental state is prescribed by the generally applicable and neutral law that applies to the case.

In *Meltebeke*, an employee filed a complaint with the Bureau of Labor and Industries (BOLI), claiming that his employer had unlawfully discriminated against him on the basis of religion. *Meltebeke*, 322 Or at 136. He alleged that, for the few weeks that he worked for his employer, the employer had persistently proselytized him. *Id.* at 134-36. He also alleged that, although his employer's proselytizing severely upset him and negatively affected his work performance, he did not feel free to complain to his employer or ask him to cease discussing religious topics, out of fear that it would jeopardize his employment. *Id.* at 136. BOLI determined that the employer had violated BOLI's administrative rule, which provided:

> "Harassment on the basis of religion is a violation of ORS 659.030.[8] Unwelcome religious advances and other verbal or physical conduct of a religious nature constitute religious harassment when:
>
> "* * * * *
>
> "(3)   such conduct has the purpose or effect of unreasonably interfering with the subject's work performance or creating an intimidating, hostile or offensive working environment."

*Id.* at 139 (citing *In the Matter of Sapp's Realty, Inc.*, 4 BOLI 232, 273 (1985)). In its written order, BOLI clarified that, when determining whether an employer had created an

---

8  *Former* ORS 659.030(1) (1995), *renumbered as* ORS 659A.030 (2011), provided:

"[I]t is an unlawful employment practice:

"* * * * *

"(b) For an employer, because of an individual's *** religion *** to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

"intimidating, hostile or offensive working environment," it would evaluate the employer's conduct from a "reasonable" employee's perspective—that is, BOLI would assess whether a reasonable employee would feel harassed by the employer's conduct. *In the Matter of James Meltebeke*, 10 BOLI 102, 115 (1992). Under that reasonable person standard, BOLI concluded that the employer's "religious conduct was sufficiently pervasive to alter the conditions of the employee's working environment and had the effect of creating an intimidating and offensive working environment." *Id.* at 116.

The employer unsuccessfully appealed BOLI's final order to the Court of Appeals, arguing that BOLI's rule implementing *former* ORS 659.030 (1995), on its face, violated Article I, sections 2 and 3, of the Oregon Constitution. *See Meltebeke*, 322 Or at 137-38 (describing procedural history). Alternatively, the employer argued that BOLI's rule, as applied to him, violated those constitutional provisions. *Id.* The employer renewed those arguments on review to this court. *Id.* at 138. In analyzing the employer's claim, this court first determined that BOLI's rule was part of a scheme that generally regulated employment discrimination and was facially nondiscriminatory because "it applie[d] equally to all employers and thereby [did] not choose among religions or beliefs." *Id.* at 148. This court then turned to the employer's as-applied challenge. It noted that BOLI had, at least implicitly, found that the employer's conduct—proselytizing—constituted a "religious practice." *Id.* at 151. Further, BOLI had found as a factual matter that the "[e]mployer had no knowledge that his religious practice created an intimidating, hostile, or offensive working environment." *Id.* The question for the court, then, was whether, in those circumstances, the employer was entitled to a defense based on Article I, sections 2 and 3. *Id.*

The court answered that question in the affirmative. It cited *Smith*, which it read to create—implicitly, if not explicitly—a new constitutional rule: "A person against whom a sanction is to be imposed for conduct that constitutes a religious practice must *know* that the conduct causes an effect forbidden by law." *Meltebeke*, 322 Or at 151 (emphasis in original). In other words, *Meltebeke* understood *Smith* as

at least implicitly importing a constitutional free exercise-based requirement that, to be held accountable for one's religiously motivated conduct, one must actually know that his or her conduct violated some rule or law. *Id.* at 151-52. Because BOLI had found that the employer in *Meltebeke* did not actually know that he was creating a hostile work environment, the court held that he could not be held liable for employment discrimination under *former* ORS 659.030 (1995). *Id.* at 153. In effect, this court in *Meltebeke* concluded that the employer was not entitled to an absolute defense based on his religious practice, but was entitled to a qualified defense that required an employee complaining of religious harassment to show that the employer had acted with a heightened mental state (knowledge) that the statute did not require.

At the outset, the state and *amicus* urge us to conclude that *Meltebeke* does not control the outcome of this case. *Amicus*, for its part, argues that this court in *Meltebeke* did not purport to announce a broadly applicable constitutional rule, but instead, announced a rule that was limited to the factual circumstances before it. The state raises a similar argument, and adds that *Meltebeke* can further be distinguished because the court, in that case, was faced with an as-applied challenge to a civil administrative rule and, just as the Court of Appeals concluded in *Beagley*, this court said nothing in *Meltebeke* to suggest that its holding was intended to apply to criminal prosecutions.

We find those arguments difficult to square with this court's broad pronouncement in *Meltebeke* that "[a] person against whom a sanction is to be imposed for conduct that constitutes a religious practice must *know* that the conduct causes an effect forbidden by law." *Meltebeke*, 322 Or at 151 (emphasis in original). For one thing, that rule speaks of "a sanction," not "a civil sanction." More importantly, though, this court in *Meltebeke* stated that the knowledge rule derived from our decision in *Smith*. At issue in *Smith* was the constitutionality of an unemployment compensation statute as applied to a discharged worker—a statute that did not impose a "sanction" at all, but instead withheld a government benefit from the unemployed worker. *See* ORS 657.176 (disqualification from unemployment compensation).

*Meltebeke* itself does not suggest that its holding is limited to the facts before it. And given that *Meltebeke* drew from a perceived holding in *Smith*—a case involving a benefit denial—and applied the same rule to a case involving a civil sanction, there is no reason to conclude that *Meltebeke*'s holding is limited to cases that, like *Meltebeke*, involve civil sanctions. In other words, there is no basis to conclude that *Meltebeke*'s holding does not extend as well to this context, *i.e.*, a case involving a criminal sanction.

The question that remains, then, is whether *Meltebeke* was correctly resolved in the first instance. In addressing that question, we acknowledge that *stare decisis* cautions us against overruling precedent. *See Farmers Ins. Co. v. Mowry*, 350 Or 686, 698, 261 P3d 1 (2011) ("We will not depart from established precedent simply because the 'personal policy preference[s]' of the members of the court may differ from those of our predecessors who decided the earlier case." (Citing *G.L. v. Kaiser Foundation Hospitals*, *Inc.*, 306 Or 54, 59, 757 P2d 1347 (1988).)). Still, *stare decisis* does not shield our decisions from later scrutiny, especially when we are dealing with matters of constitutional significance. *See Mowry*, 350 Or at 694 ("[T]here is a[n] *** important need to be able to correct past errors because this court is the body with the ultimate responsibility for construing our constitution, and if we err, no other reviewing body can remedy that error." (Internal citations and alteration marks omitted.)).

Indeed, in *Couey v. Atkins*, 357 Or 460, 485-86, 355 P3d 866 (2015), we recently summarized three "categories" of errors that would warrant our reconsideration of constitutional decisions: (1) rulings that amount to *dicta*; (2) rulings that are "clearly incorrect" because they have no grounding in the constitutional provision's text or context; and (3) rulings that cannot be reconciled with this court's other cases. In this case, the state has advanced an argument that falls into the second category of errors that we discussed in *Couey*. That is, the state has argued that *Meltebeke* should not control the outcome of this case because the "knowledge" requirement adopted in *Meltebeke* derives from the court's faulty interpretation of *Smith*, and not from the text of Article I, sections 2 and 3, itself. We agree. *Smith*, as we

will explain, did not hold—certainly not explicitly, but not implicitly either—that whether the government may impose a sanction for conduct that constitutes a religious practice depends on a showing that the person sanctioned knew that the conduct would cause an effect forbidden by law.

*Smith* arose because an employee (Smith) was fired from his position as an alcohol abuse counselor when his employer learned that he had ingested peyote after hours as part of a Native American religious ceremony. *Smith*, 301 Or at 212. Because Smith's employer provided alcohol and drug abuse counseling services, it had a strict anti-drug policy, of which Smith was aware. *Id.* at 211-12. After he was fired, Smith filed a claim with the Employment Division to receive unemployment compensation. *Id.* at 212. The division denied his claim based on its administrative rule that disqualified a claimant from receiving unemployment compensation if the claimant was discharged because the claimant had "willful[ly] violat[ed] *** the standards of behavior which an employer has the right to expect of an employee." *Id.* at 215 (quoting OAR 471-30-038(3)). And because Smith knew that his employer enforced a strict anti-drug policy, the division concluded that he had "willfully violated" that standard of behavior. *Id.* at 212.

Smith appealed, arguing that the division's denial of his claim violated his free exercise rights under Article I, sections 2 and 3, of the Oregon Constitution, because he had ingested peyote as part of a religious ceremony. *Id.* This court determined that the division's rule was generally applicable and neutral, because it applied to any person who had been fired for misconduct, regardless of the person's motivation for engaging in that misconduct. *Id.* at 214-15. The division's rule, therefore, did not specifically target religion or religious exercise. *Id.* at 215. This court then reasoned that Smith had not shown that the division's administrative rule had burdened his free exercise of religion; instead, Smith had shown that his employer's policy of firing any employee who used drugs—no matter the employee's motivation for doing so—had burdened his free exercise of religion. *Id.* at 216. The court then concluded: "[I]t was not the government that disqualified [Smith] from his job for ingesting peyote. And the rule denying unemployment benefits to one who loses his

job for what an employer permissibly considers misconduct, conduct incompatible with doing the job, is itself a neutral rule." *Id.* This court thus concluded that the division's rule comported with Article I, sections 2 and 3. *Id.*

This court's decision in *Smith*, then, did not turn on whether Smith knew that he was violating his employer's anti-drug policy; rather, Smith's "knowledge" was relevant only to whether he had engaged in misconduct that disqualified him from benefits under the statutory unemployment compensation scheme. The court mentioned Smith's knowledge in passing—as the factual predicate for Smith's administrative disqualification. That disqualification then set up the constitutional issue of whether Smith was nevertheless entitled to benefits because his peyote use was integral to his practice of his religion. The court's conclusion that Smith was not entitled to those benefits turned on the generally applicable and neutral nature of the administrative rule. Smith's knowledge of his employer's policy had no bearing on the constitutional analysis. When this court later, in *Meltebeke*, said that *Smith* attributed constitutional significance to Smith's knowledge of his employer's policy, *Meltebeke*, 322 Or at 151, the court in *Meltebeke* simply got *Smith* wrong.

Significantly, *Meltebeke* offered no rationale of its own for imposing a "knowledge" requirement—that is, a requirement that, to impose a sanction for a religious practice that violates the law, the person to be sanctioned must first know that the conduct causes an effect that is unlawful. Nor have defendants in this case advanced any argument about *why* requiring proof of knowledge rather than criminal negligence in this case would have any grounding in the free exercise principle they invoke. Said another way, defendants have not explained why knowledge is constitutionally relevant to their free exercise claim. Nor is its relevance apparent. When pressed on the issue at oral argument, defendants' counsel responded that a knowledge requirement would better protect sincere religious beliefs than a criminal negligence standard because, with criminal negligence, the jury must evaluate a defendant's conduct from the perspective of a "reasonable person." In the context of these charges, counsel asserted, the jury necessarily had

to evaluate whether defendants' religious conduct—faith healing—was a "reasonable" practice. In counsel's view, asking whether defendants knew that David would die as a result of their conduct would avoid giving the jury discretion to evaluate the reasonableness of defendants' religious practice.

That argument, however, rests on a faulty premise. The criminal negligence standard, applied in the context of this case, directed the jury to determine whether the defendants "fail[ed] to be aware of a substantial and unjustifiable risk" that David would die if they failed to seek medical treatment for him. *See* ORS 161.085 (defining criminal negligence). Further, the risk must have been "of such nature and degree that the failure to be aware of it constitute[d] a gross deviation from the standard of care that a *reasonable person* would [have] observe[d] in the situation." *Id.* (emphasis added). So framed, the inquiry was not whether defendants' religiously motivated conduct was reasonable; instead, the inquiry was whether a reasonable person would have been aware of the *risk* of David's death. Counsel's concern that the criminal negligence standard under the statute requires the jury impermissibly to make a value judgment on defendants' religious beliefs or practices is unfounded. Nor are we able to see how requiring a mental state of knowledge instead of criminal negligence in this context advances the constitutional principle that defendants invoke.

Consequently, we disavow our holding in *Meltebeke* to the extent that it relied on *Smith*. *Smith* provided no authority to require knowledge on the part of the employer in *Meltebeke* that his religiously motivated conduct had a harassing effect on his employee before the employer could, consistently with free exercise principles, be civilly sanctioned for that harassment. And *Meltebeke* itself provided no rationale for the rule it announced apart from its reliance on *Smith*. We have no occasion in this case to decide whether or under what circumstances the religious nature of a person's conduct may provide either an absolute or a qualified defense to a civil or criminal law that, on generally applicable and neutral terms, forbids the conduct or the effect of the conduct. Nor do we have occasion to decide whether *Meltebeke*, although incorrectly reasoned, might have reached the same

or a similar result (limiting BOLI's authority to impose a sanction) on some different rationale. In this case, the only issue before us is whether, under *Meltebeke*, the state was required by free exercise principles to prove that defendants acted or failed to act with a knowing, rather than criminally negligent, mental state. We hold that it was not.

IV

As we stated in *Brumwell* and reiterate in this case, parties who present an as-applied challenge to a generally applicable and neutral law must make "an individual claim to exemption [from that law] on religious grounds." *Brumwell*, 350 Or at 108 (citing *Cooper*, 301 Or at 368-69). Defendants have not requested a religious exemption from the second-degree manslaughter statute. Instead, they have—from pre-trial and consistently since—argued that, under *Meltebeke*, the state bears the burden of proving a culpable mental state higher than that required by ORS 163.125. This case does not present—and accordingly we decline to consider—the broader question of when a generally applicable and neutral law must yield to an individual's claim for exemption on religious grounds. We conclude that the trial court did not err in refusing to give defendants' requested jury instruction.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.